EVELYN SMITH, APPELLANT, V. DR. MICHAEL WEAVER ET AL., APPELLEES.

407 N.W.2d 174

Filed June 12, 1987.   No. 85-684.

Jesse O. Irvin II, for appellant.

Joni R. Kerr of Kennedy, Holland, DeLacy & Svoboda, for appellee Weaver.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

Appellant, Evelyn Smith, sued appellee Dr. Michael Weaver, a Nebraska physician qualified under the Nebraska Hospital-Medical Liability Act, Neb. Rev. Stat. §§ 44-2801 et seq. (Reissue 1984), and practicing at Omaha, alleging that he breached the professional duties he owed her as his patient. The district court sustained Weaver's motion for summary judgment, thereby dismissing Smith's petition as to him. She appeals and assigns that action as error, claiming that there exists a genuine issue of material fact. We affirm.

Smith alleged that Weaver was negligent in a number of respects, but the specific allegation on which this appeal is grounded asserts that Weaver was negligent in failing to warn Smith of the adverse side effects attendant to the taking of the prescribed medication, Clinoril.

The record establishes that Weaver first saw Smith as a patient from August through November of 1977. Smith had been experiencing, among other symptoms, fatigue, itching, hair loss, sores, and facial bumps. After hospitalizing her for a week during this period, Weaver diagnosed Smith's condition as possible systemic lupus erythematosus, a disorder of the connective tissue.

When Smith next saw Weaver, on July 24, 1979, she was experiencing increased swelling of her hands and feet and stiffness of her whole body, and was lightheaded and dizzy. After his examination and study of laboratory tests, Weaver

diagnosed joint complaints and, as he had earlier, possible lupus. According to Smith, she had also been diagnosed as having arthritis. Weaver reviewed the situation with Smith on August 7, 1979, and prescribed Clinoril. According to Weaver, he advised Smith of the "primary," or "common," side effects of the drug, being dermatologic and gastrointestinal in character, and instructed her to call him if she experienced any problems. Smith denies being told of any side effect whatsoever, and states she was told only that the drug was new and "good and strong" and that Weaver wanted her to try it.

On August 8, 1979, Smith reported to Weaver by telephone that she had taken two Clinoril tablets as instructed and that her hands were swollen. According to Smith, she had also vomited and her entire body swelled and itched. Weaver believed these manifestations resulted from the disease process, and advised Smith to continue taking the Clinoril but to see him if she did not improve. Smith took two more tablets and saw Weaver the following day, August 9, 1979. Smith reported that her hands and feet were swollen, and itched. It was still Weaver's impression that Smith was most likely experiencing a flareup of the lupus but could not rule out an allergic reaction to the Clinoril. According to Weaver, there exists no test for determining whether one is allergic to Clinoril. He thus instructed her to discontinue the Clinoril, and put her on different medication. During three more telephone calls in August of 1979, Smith reported she was improving somewhat but still had pain, and her hands had peeled. Smith last saw Weaver on September 5, 1979, at which time she complained of a shoulder problem and that her hands had continued to peel.

Smith asserts that following her experience with Clinoril, she lacks energy, has pain, develops sores, has white spots on her head, her cuticles grew over her nails and were pussy, and her mouth has become dry, as the result of which her ability to speak has been adversely affected, as has her ability to eat and sleep. She can no longer work or enjoy life.

Weaver stated that he exercised the reasonable and ordinary care, skill, and knowledge ordinarily possessed and used under like circumstances by members of his profession in Omaha and similar communities, an opinion confirmed by the medical

review panel convened pursuant to the Nebraska Hospital-Medical Liability Act. The record contains no countervailing expert evidence.

A summary judgment is to be granted where there exists no genuine issue either as to any material fact or as to the ultimate inferences to be drawn therefrom, and the moving party is entitled to judgment as a matter of law. *Naidoo v. Union Pacific Railroad*, 224 Neb. 853, 402 N.W.2d 653 (1987); *Bohannon v. Guardsman Life Ins. Co.*, 224 Neb. 701, 400 N.W.2d 856 (1987); *Witherspoon v. Sides Constr. Co.*, 219 Neb. 117, 362 N.W.2d 35 (1985). The party moving for summary judgment must make a prima facie showing that if the evidence were uncontroverted at trial, he or she would be entitled to judgment as a matter of law. Such a showing shifts the burden of producing evidence as to a factual issue to the party opposing the motion. The court then views the evidence in a light most favorable to the party opposing the motion, and decides only whether there is an issue of fact, not how such an issue should be decided. *Marshall v. Radiology Assoc., ante* p. 75, 402 N.W.2d 855 (1987); *Naidoo v. Union Pacific Railroad, supra*.

Applying those principles in *Hanzlik v. Paustian*, 211 Neb. 322, 318 N.W.2d 712 (1982), we reversed the summary judgment entered in favor of the defendant physician, where the plaintiff patient's esophagus was perforated during a dilation procedure and the physician had offered no evidence that he had met the requisite standard of care. In doing so, we held that whether a specific manner of treatment by a physician demonstrates a lack of skill or knowledge or a failure to exercise reasonable care is a matter usually to be proved by expert testimony. Accord *Marshall v. Radiology Assoc., supra*. On remand, the physician in *Hanzlik v. Paustian*, 216 Neb. 575, 344 N.W.2d 649 (1984), *cert. denied* 469 U.S. 854, 105 S. Ct. 179, 83 L. Ed. 2d 113, again moved for summary judgment and on this occasion filed an affidavit to the effect he had followed the generally accepted and recognized standard of care or skill in the relevant and similar communities. We concluded that in the absence of countervailing evidence the affidavit established the physician's entitlement to a summary judgment dismissing the plaintiff patient's petition.

Smith contends, however, that the *Hanzlik* cases have no application when the claim is that a physician failed to warn of the possible side effects of a drug, thereby rendering the patient's consent to the treatment an uninformed one. She argues, in effect, that in such a situation the conclusion to be drawn from the facts does not require specific, technical, or scientific knowledge and that since the circumstances surrounding the injury are within the common experience, knowledge, and observation of laymen, expert testimony is not required. *Reifschneider v. Nebraska Methodist Hosp.*, 222 Neb. 782, 387 N.W.2d 486 (1986).

In so arguing, she places heavy reliance upon *Mitchell v. Robinson*, 334 S.W.2d 11 (Mo. 1960), which stated that because the insulin shock therapy used was a rather new and radical procedure producing a high incidence of serious and permanent injuries, the treating physician had a duty to warn the plaintiff patient generally of the risks attendant to the treatment and that a jury question was presented as to whether the physicians had properly executed their respective duty in that regard. As Smith acknowledges, however, *Aiken v. Clary*, 396 S.W.2d 668 (Mo. 1965), disapproved *Mitchell*. The *Aiken* court did so on the basis that there had been no expert testimony to establish what the patient should have been told. *Aiken* held that where the nature and sufficiency of the warning given the patient is in issue, expert evidence is required to show what disclosures a reasonable medical practitioner would have given under the same or similar circumstances. The *Aiken* court, however, distinguished the situation in which no warning was given from the situation in which the issue relates to the sufficiency of a warning which was given.

With all due respect, it seems to us that such a distinction is illusory. The question of whether, under a particular set of circumstances, anything at all should be said to a patient is no different in character than the question of how much should be said. Nonetheless, as *Woolley v. Henderson*, 418 A.2d 1123 (Me. 1980), details, there are two views on the nature of the duty of a physician to disclose the risks of a particular treatment. The "professional" theory holds that the duty is measured by the standard of the reasonable medical

practitioner under the same or similar circumstances, and must be determined by expert medical testimony establishing the prevailing standard and the defendant practitioner's departure therefrom. On the other hand, the "material risk" theory holds the duty to disclose is measured by the patient's need for information to balance the probable risks against the probable benefits in making the decision to either undergo or forgo the treatment proposed. Although under this theory expert medical testimony may be necessary to establish the undisclosed risk as a known danger of the procedure, expert testimony is not required to establish the physician's duty to disclose, and the fact finder can decide, without the aid of a medical expert, whether a reasonable person in the patient's position would have considered the risk significant in making his or her decision.

The Legislature of this state has declared that before there may be recovery in a medical negligence case based upon the failure of a medical care provider, such as a physician, to obtain an informed consent to the treatment, the plaintiff must establish that a "reasonably prudent person in the plaintiff's position would not have undergone the treatment had he or she been properly informed and that the lack of informed consent was the proximate cause of the injury and damages claimed." § 44-2820.

Informed consent is defined in § 44-2816 as "consent to a procedure based on information which would ordinarily be provided to the patient under like circumstances by health care providers engaged in a similar practice in the locality or in similar localities." Nebraska has therefore been committed by its Legislature to the "professional" theory, under which expert evidence is indispensable to establish what information would ordinarily be provided under the prevailing circumstances by physicians in the relevant and similar localities.

That being so, the uncontradicted evidence that Weaver followed the generally accepted and recognized standard of care or skill in the relevant and similar communities renders the genuine factual issue as to whether he gave Smith any warning an immaterial one, for there is no competent evidence that he was required to give any warning at all.

The district court's judgment, being correct, is affirmed.

AFFIRMED.

KRIVOSHA, C.J., dissenting.

I must respectfully dissent from the majority opinion in this case. I do so on two grounds.

First, I do not accept the conclusion that the propriety or necessity of a warning is not medically established by the record before us. In his affidavit, Dr. Weaver states:

> 3. At the time he prescribed Clinoril, Affiant also advised the Plaintiff of the primary side-effects of the drug, and instructed her to contact him if she had any problems.
>
> . . . .
>
> 10. In *prescribing* the Clinoril to the Plaintiff on August 7, 1979, in instructing the Plaintiff to continue taking the Clinoril on August 8, 1979, in instructing the Plaintiff to discontinue the Clinoril on August 9, 1979, and in all care and treatment rendered to the Plaintiff on or after July 24, 1979, Affiant exercised the ordinary and reasonable care, skill and knowledge <u>ordinarily possessed and used under like circumstances by members of his profession engaged in a similar practice in Omaha, Nebraska, and in similar communities</u>.

(Emphasis supplied.) If in fact expert testimony was required, Dr. Weaver provided that testimony. It was not therefore incumbent upon the appellant to provide her own medical testimony, but, rather, she could take advantage of the affidavit filed by Dr. Weaver.

Second, I believe that the majority is in error in concluding that because of the definition of informed consent set out in Neb. Rev. Stat. § 44-2816 (Reissue 1984), Nebraska has been committed "by its Legislature to the 'professional' theory, under which expert evidence is indispensable to establish what information would ordinarily be provided under the prevailing circumstances by physicians in the relevant and similar localities."

I believe that the majority is in error in that regard. Quite to the contrary, I believe that by adopting Neb. Rev. Stat. § 44-2820 (Reissue 1984), the Legislature of the State of

Nebraska has committed this state to the "material risk" theory. Section 44-2820 specifically establishes the burden of proof which must be met by one who has actually suffered damages because the treating physician did not first obtain an informed consent. The statute provides:

> Before the plaintiff may recover any damages in any action based on failure to obtain informed consent, it shall be established by a preponderance of the evidence that a reasonably prudent person in the plaintiff's position would not have undergone the treatment had he or she been properly informed and that the lack of informed consent was the proximate cause of the injury and damages claimed.

This is the definition of the "material risk" theory, and not the "professional" theory. As noted by the majority, the " 'professional' theory holds that the duty is measured by the standard of the reasonable medical practitioner under the same or similar circumstances," while the "material risk" theory holds that the duty to disclose is to be measured by the patient's need for information to balance the probable risks against the probable benefits in making the decision to either undergo or forgo the treatment proposed. An example of the "material risk" theory is found in the case of *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977). The central issue in the *Sard* case was whether the appellants had presented evidence legally sufficient to permit a jury to decide whether the appellee doctor was negligent in failing to advise the appellants that a tubal ligation, which he performed on Mrs. Sard, might not succeed in preventing future pregnancies, and in failing to disclose alternative means of achieving the desired result. In concluding that there was sufficient evidence, the Maryland court reviewed the concept of "informed consent," and said:

> The doctrine of informed consent, which we shall apply here, follows logically from the universally recognized rule that a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient. [Citations omitted.] In order for the patient's consent to be effective,

it must have been an "informed" consent, one that is given after the patient has received a fair and reasonable explanation of the contemplated treatment or procedure.

*Id.* at 438-39, 379 A.2d at 1019.

The court then went on to observe:

The major areas of dispute focus on: (1) the scope of the physician's duty to warn, that is, whether the duty is to be measured by a professional standard of care or a general reasonableness standard; (2) whether expert medical testimony is required to prove the standard of care; and (3) the appropriate test for proving causal connection between the failure to disclose and any resulting injury or damage.

*Id.* at 440, 379 A.2d at 1020.

The Maryland court then concluded that Maryland followed the "material risk" theory, saying:

"The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is whatever is material to the decision. Thus, the test for determining whether a potential peril must be divulged is its materiality to the patient's decision." [Citation omitted.]

. . . Whether a physician has fulfilled his duty to disclose, then, is to be determined by reference to a general standard of reasonable conduct and is not measured by a professional standard of care.

*Id.* at 443-44, 379 A.2d at 1022. In my view, the definition as set out by the Maryland court is what is required under § 44-2820.

Even if we are said to be a "professional" theory jurisdiction, or some hybrid, I believe the majority opinion is in error insofar as the granting of a summary judgment is concerned.

The Kansas Supreme Court's decision in *Natanson v. Kline,* 186 Kan. 393, 350 P.2d 1093 (1960) (*Natanson I*), is generally recognized as the leading authority in support of the "professional" theory in cases of informed consent. See *Sard v. Hardy, supra.* In *Natanson I,* the Kansas court said:

In our opinion the proper rule of law to determine whether a patient has given an intelligent consent to a proposed form of treatment by a physician was stated and

applied in *Salgo v. Leland Stanford, Etc. Bd. Trustees,* [154 Cal. App. 2d 560, 317 P.2d 170 (1957)]. This rule in effect compels disclosure by the physician in order to assure that an informed consent of the patient is obtained. The duty of the physician to disclose, however, is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances. How the physician may best discharge his obligation to the patient in this difficult situation involves primarily a question of medical judgment. So long as the disclosure is sufficient to assure an informed consent, the physician's choice of plausible courses should not be called into question if it appears, all circumstances considered, that the physician was motivated only by the patient's best therapeutic interests and he proceeded as competent medical men would have done in a similar situation.

186 Kan. at 409-10, 350 P.2d at 1106.

Nevertheless, after declaring Kansas to be a "professional" theory state, the Kansas court on rehearing held that expert testimony was not necessary in order to present the issue to the trier of fact. In *Natanson v. Kline,* 187 Kan. 186, 189-90, 354 P.2d 670, 673 (1960) (*Natanson II*), the Kansas court went to great lengths to explain this difference:

Conceivably, in a given case as indicated in the opinion, no disclosures to a patient may be justified where such practice, under given facts and circumstances, is established by expert testimony to be in accordance with that of a reasonable medical practitioner under the same or similar circumstances. But on the state of the record here presented the appellant was not required to produce expert medical testimony to show that the failure of Dr. Kline to give any explanation or make any disclosures was contrary to accepted medical practice. To hold otherwise would be a failure of the court to perform its solemn duty.

Whether or not a physician has advised his patient of the inherent risks and hazards in a proposed form of treatment is a *question of fact* concerning which lay witnesses are competent to testify, and the establishment of such fact is not dependent upon expert medical

testimony. It is only when the facts concerning the actual disclosures made to the patient are ascertained, or ascertainable by the trier of the facts, that the expert testimony of medical witnesses is required to establish whether such disclosures are in accordance with those which a reasonable medical practitioner would make under the same or similar circumstances.

(Emphasis in original.)

In the instant case, appellant maintains that she received no warnings. On that basis, even under the "professional" theory, appellant has established a genuine issue of a material fact so as to preclude the appellee from being granted summary judgment.

The majority suggests that the distinction between "no warning" and an "inadequate warning" is illusory. I do not agree. By his own affidavit, Dr. Weaver established that Clinoril had known side effects. If, as appellant alleges, appellee failed to disclose any known side effects to the appellant, appellee would be liable as a matter of law, as noted by the Kansas court in *Natanson II*: "He made no disclosures. He was silent. On this state of the record Dr. Kline failed in his legal duty to make a reasonable disclosure to the appellant who was his patient *as a matter of law*." (Emphasis in original.) *Id*. at 189, 354 P.2d at 673. It may be that there is a legal defense for failing to make the disclosure. The appellee may present expert testimony justifying his action either in failing to give any warnings, as alleged by appellant, or in giving the warnings which he did give, as alleged by the appellee. Nevertheless, those are questions of fact to be resolved in a trial and not to be disposed of by summary judgment. The judgment of the district court should have been reversed and the matter ordered to trial.

I am authorized to state that WHITE and SHANAHAN, JJ., join in this dissent.