HARRY A. ECCLESTON, APPELLANT AND CROSS-APPELLEE, V. DAVID H. CHAIT, APPELLEE AND CROSS-APPELLANT.
492 N.W.2d 860

Filed December 4, 1992.    No. S-89-1352.

James R. Welsh, of Welsh & Sibbernsen, for appellant.

Joseph F. Bataillon, of Sodoro, Daly & Sodoro, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

Harry A. Eccleston appeals from the judgment on a verdict for Dr. David H. Chait in a medical malpractice action based on inadequacy of information for an informed consent to a stapedectomy. In his appeal, Eccleston claims that he is entitled to a new trial as the result of misconduct during the jury's deliberations. Chait cross-appeals and contends that the district court for Douglas County, pursuant to Chait's motion, should have directed a verdict for Chait at the conclusion of all evidence in the trial.

Chait has asserted his cross-appeal under Neb. Ct. R. of Prac. 1E (rev. 1992), which states: "Cross-Appeal. The proper filing of an appeal shall vest in an appellee the right to a cross-appeal against any other party to the appeal. The cross-appeal need only be asserted in the appellee's brief as provided by rule 9D(4)." We note that in *Atokad Ag. & Racing v. Governors of Knts. of Ak-Sar-Ben*, 237 Neb. 317, 325, 466 N.W.2d 73, 79 (1991), we state that a party "not aggrieved by [a] judgment . . . cannot appeal." See, also, *Federal Dep. Ins. Corp. v. Swanson*, 231 Neb. 148, 150, 435 N.W.2d 659, 660 (1989): "Only a party aggrieved by an order or judgment can

appeal; one who has been granted that which he or she sought has not been aggrieved." In light of Rule 1E, the current rule allowing a cross-appeal, we overrule *Atokad Ag. & Racing v. Governors of Knts. of Ak-Sar-Ben, supra*, and *Federal Dep. Ins. Corp. v. Swanson, supra*, insofar as those decisions, and any other similar decision of this court, express the principle that only an aggrieved party can cross-appeal in an appeal otherwise perfected to the Nebraska Supreme Court or the Nebraska Court of Appeals. Therefore, although Chait obtained a judgment on a verdict favorable to him, he is allowed, nevertheless, to maintain a cross-appeal under the circumstances.

Consequently, as a logical starting point, we first examine the merit of Chait's cross-appeal, for if the case should not have been submitted to the jury, consideration of questions about misconduct during jury deliberations is unnecessary for disposition of the present appeal.

## STANDARD OF REVIEW

A party against whom a motion to dismiss is directed is entitled to have all relevant evidence accepted or treated as true, every controverted fact as favorably resolved, and every beneficial inference reasonably deducible from the evidence. . . .

"A court cannot decide an issue as a matter of law unless the facts adduced on an issue are such that reasonable minds can draw but one conclusion from the evidence. . . . In a jury trial, when evidence compels but one reasonable conclusion regarding an issue or question in the litigation, a court can properly direct a verdict on such issue or question."

*Burns v. Veterans of Foreign Wars*, 231 Neb. 844, 850, 438 N.W.2d 485, 489-90 (1989) (quoting from *Anderson v. Union Pacific RR. Co.*, 229 Neb. 321, 426 N.W.2d 518 (1988)). Accord, *Dale v. Thomas Funeral Home*, 237 Neb. 528, 466 N.W.2d 805 (1991); *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987).

## ECCLESTON'S HEARING PROBLEM AND SURGERY

Since 1983, Eccleston had a hearing problem in his left ear

and wore a hearing aid. In 1985, Eccleston was referred to Chait, an otolaryngologist, that is, a physician who specializes in the medical and surgical treatment of problems involving the head and neck, including ears, nose, and throat. Chait diagnosed Eccleston's ear problem as otosclerosis, a degenerative pathological condition of spongy bone that adversely affects the stapes bone within the ear and results in loss of hearing.

The stapes is the innermost of three bones located in the middle ear. After entering the ear and proceeding down the ear canal, sound waves produce vibrations in the eardrum. These vibrations activate an adjacent bone, the malleus, or "hammer," which articulates with another bone, the incus, or "anvil," transmitting vibrations to the stapes, or "stirrup," the small bone that imparts the vibrations to the membrane of the inner ear containing a fluid. The vibrations, thus transmitted, then set the inner ear's fluid in motion so that the vibrations are received by nerve endings for transmission by the auditory nerve to the brain.

In otosclerosis, the stapes, or stirrup, has been immobilized by bony growth so that on receiving vibrations transmitted from the incus and malleus, the stirrup is unable to "wiggle and transmit sound" into the adjoining fluid chamber of the inner ear for transmission to the brain. A stapedectomy is the only medically recognized surgical procedure to eliminate otosclerosis. During a stapedectomy, a surgeon removes the stapes, or stirrup, and replaces it with a prosthesis that conducts vibrations to the inner ear.

On September 5, 1985, in Omaha, Chait performed a stapedectomy on Eccleston's left ear. As the result of the surgery, Eccleston sustained a total loss of hearing in his left ear.

In his negligence action against Chait, Eccleston claimed that Chait had failed "to inform and advise the plaintiff of the risks of a left stapedectomy to include a total loss of hearing." Notwithstanding Chait's motion for a directed verdict at conclusion of all the evidence, the case was submitted to the jury, which returned a verdict for Chait. Eccleston sought, but the court denied, a new trial as the result of alleged misconduct during jury deliberations. Eccleston appeals; Chait

cross-appeals.

## EVIDENCE DURING TRIAL

Eccleston testified that in a visit before the surgery, Chait told Eccleston that there was a "95 percent or 90 percent success rate" and a "5 percent failure rate" in stapedectomies, but did not tell Eccleston that loss of hearing was a risk and possible result of the operation.

In his case in chief, Eccleston introduced Chait's deposition, in which the physician acknowledged that he "routinely" informed a stapedectomy patient that "the operation on occasion is not successful and that the hearing may be lost," although Chait did not recall giving Eccleston the foregoing information before the stapedectomy. Eccleston also called Chait as a witness regarding the standard of care in Omaha for physicians' informing patients about the risks of a stapedectomy. During direct examination of Chait, the following exchange occurred:

Q. Back in September of 1985, wasn't it the standard in Omaha for physicians to advise the patients that they could lose their total hearing in the ear that you were doing a stapedectomy on?

A. Yeah. I think that the standard in '85 was that the physician should advise the patient that the operation was not without risk and that there could be failures.

Q. All right. And these failures would include the loss of hearing to the ear of the surgical ear?

A. Those failures would include that, yes.

. . . .

Q. And by 'failure,' you mean the loss of hearing of the ear?

A. By 'failure' that's what I am referring to, yes.

Chait further testified that even in a surgically correct stapedectomy, a loss of hearing may occur because the auditory nerve "cannot tolerate the energy of the operation and it essentially dies."

Dr. James Werth, an ear, nose, and throat specialist practicing in the Omaha area, testified for Chait concerning the standard of care and information imparted to a prospective

surgical patient for a stapedectomy in 1985. According to Werth, all necessary information was communicated by conversation with a prospective patient "so that an intelligent decision could be made as to whether or not the individual wanted to have this procedure done." Regarding a stapedectomy, Werth testified that the standard of care required that the physician "explain to the patient that there is a failure rate" of 5 percent, and he testified that a physician's telling a patient that there is "a five percent risk of failure" in stapedectomies is "consistent" with the standard of care concerning an informed consent for a stapedectomy. Finally, Werth expressed his opinion that Chait "did meet the standard of care in the stapedectomy surgery" and that Chait obtained informed consent for the surgical procedure performed on Eccleston.

At conclusion of all the evidence, Chait moved for a directed verdict on the basis that there was no evidence that the standard of care in Omaha required that a physician, before a stapedectomy, inform the patient concerning the possibility of loss of hearing as a result of the stapedectomy. The court refused to direct a verdict for Chait and submitted the case to the jury, which returned its verdict for Chait.

## INFORMED CONSENT

Nebraska's statutory standard for "informed consent," as a part of the Nebraska Hospital-Medical Liability Act, Neb. Rev. Stat. §§ 44-2801 to 44-2855 (Reissue 1988), is § 44-2816, which states:

> Informed consent shall mean consent to a procedure based on information which would ordinarily be provided to the patient under like circumstances by health care providers engaged in a similar practice in the locality or in similar localities. Failure to obtain informed consent shall include failure to obtain any express or implied consent for any operation, treatment, or procedure in a case in which a reasonably prudent health care provider in the community or similar communities would have obtained an express or implied consent for such operation, treatment, or procedure under similar circumstances.

As pointed out in Prosser and Keeton on the Law of Torts § 32 at 190 (5th ed. 1984):

> The informed consent doctrine is based on principles of individual autonomy, and specifically on the premise that every person has the right to determine what shall be done to his own body. Surgeons and other doctors are thus required to provide their patients with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of treatment or surgical procedure. Such a disclosure should include the nature of the pertinent ailment or condition, the risks of the proposed treatment or procedure, and the risks of any alternative methods of treatment, including the risks of failing to undergo any treatment at all. Thus, although the procedure be skillfully performed, the doctor may nevertheless be liable for an adverse consequence about which the patient was not adequately informed.

There are two different theories regarding the extent of a physician's duty to disclose the risks of a particular treatment or procedure, namely, the "material risk" theory and the "professional" theory.

> The "professional" theory holds that the duty is measured by the standard of the reasonable medical practitioner under the same or similar circumstances, and must be determined by expert medical testimony establishing the prevailing standard and the defendant practitioner's departure therefrom. On the other hand, the "material risk" theory holds the duty to disclose is measured by the patient's need for information to balance the probable risks against the probable benefits in making the decision to either undergo or forgo the treatment proposed. Although under this theory expert medical testimony may be necessary to establish the undisclosed risk as a known danger of the procedure, expert testimony is not required to establish the physician's duty to disclose, and the fact finder can decide, without the aid of a medical expert, whether a reasonable person in the patient's position would have considered the risk significant in making his or

her decision.

*Smith v. Weaver*, 225 Neb. 569, 573-74, 407 N.W.2d 174, 178 (1987).

The material risk theory protects a patient's "right of physical self-determination [because it] mandates that the scope of a physician's duty to disclose therapeutic risks and alternatives be governed by the patient's informational needs." *Sard v. Hardy*, 281 Md. 432, 442, 379 A.2d 1014, 1021 (1977). Also, the professional theory "paternalistically leaves the right of choice to the medical community, in derogation of the patient's right of self-determination." Prosser and Keeton, *supra* at 191. Nevertheless, as the result of § 44-2816, "Nebraska has therefore been committed by its Legislature to the 'professional' theory, under which expert evidence is indispensable to establish what information would ordinarily be provided under the prevailing circumstances by physicians in the relevant and similar localities." *Smith v. Weaver*, 225 Neb. at 574, 407 N.W.2d at 179. Thus, notwithstanding voluminous criticism of the professional theory of informed consent, this court is bound by § 44-2816 as a statutory standard and prescription for an informed consent.

In a medical malpractice or negligence action, expert testimony is required to prove the standard of care in an informed consent case. See, *Turek v. St. Elizabeth Comm. Health Ctr.*, ante p. 467, 488 N.W.2d 567 (1992); *Jones v. Malloy*, 226 Neb. 559, 412 N.W.2d 837 (1987); *Smith v. Weaver*, *supra*.

The crucial question in Eccleston's case is whether Chait, in supplying information for Eccleston's consent to the stapedectomy, was required to specifically tell Eccleston that a stapedectomy included the risk of a possible total loss of hearing in the ear involved in the operation.

In visiting with Eccleston, Chait did not mention the possibility of a loss of hearing as a result of the prospective stapedectomy, although Chait usually, or "routinely," mentioned such possibility to his stapedectomy patients. However, the standard of care in a medical malpractice or negligence action based on inadequate information for a patient's consent to an operation, treatment, or procedure is not

determined by a defendant physician's personal or customary routine, but, rather, is based on information which physicians ordinarily supply to patients in like circumstances in the locality or similar localities. See § 44-2816. Consequently, although Chait usually, or routinely, informed stapedectomy patients concerning the possibility of a hearing loss resulting from the surgical procedure, Chait's personal standard regarding information for a patient's consent is irrelevant as a standard for evaluating Chait's medical conduct in relation to Eccleston's medical negligence claim. Rather, the issues in Eccleston's case are: (1) In conformity with the standard of care in the locality, what information do physicians supply to prospective surgical patients regarding risk involved in a stapedectomy? and (2) did Chait impart to Eccleston the information required under the applicable standard of care?

Both Chait and Werth testified that the standard of care concerning an informed consent for a stapedectomy required that a physician tell a surgical patient that there was a 5-percent risk of failure in stapedectomies. According to Chait and Werth, elaboration or specification of the exact nature of any aspect of risk is not part of the information required to be given by a physician for informed consent of a stapedectomy patient. Thus, as testified by Chait and Werth, who were the only witnesses concerning the standard of care regarding an informed consent for a stapedectomy in Omaha during 1985, a physician's telling a patient that there was a 5-percent failure rate in stapedectomies satisfied the standard of care concerning information for an informed consent to a stapedectomy. Therefore, under the standard of care prevailing when Chait visited with Eccleston about the prospective stapedectomy, a physician was not required to tell a patient that the 5-percent failure rate included a possible loss of the patient's hearing. This standard of care places a patient, who more than likely lacks a medical background or training, in the precarious position of exploring and inquiring about adverse consequences of a surgical procedure. Nonetheless, that is precisely the position of a patient under the professional theory of informed consent expressed in § 44-2816 as acknowledged by *Smith v. Weaver*, 225 Neb. 569, 407 N.W.2d 174 (1987).

In the final analysis, Eccleston's evidence on the applicable standard of care concerning information required to be given to a patient for an informed consent to a stapedectomy showed Chait's medical conduct conformed with the standard of care in Omaha during 1985. Conversely, Eccleston failed to present evidence that Chait's conduct did not meet the standard of care. Consequently, Eccleston failed to establish a prima facie case of medical negligence by Chait. "A 'prima facie case' means that evidence sufficiently establishes elements of a cause of action and, notwithstanding a motion for a directed verdict in a jury trial or a motion to dismiss in a nonjury trial, allows submission of the case to the fact finder for disposition." *Dale v. Thomas Funeral Home*, 237 Neb. 528, 529, 466 N.W.2d 805, 807 (1991). Accord, *State v. Jasper*, 237 Neb. 754, 467 N.W.2d 855 (1991); *Chapman v. Union Pacific Railroad*, 237 Neb. 617, 467 N.W.2d 388 (1991). For that reason, Chait's motion for a directed verdict should have been granted, and Eccleston's negligence action against Chait should have been dismissed and not submitted to the jury.

We, therefore, reverse the judgment of the district court and remand this matter to the district court with direction to dismiss Eccleston's action against Chait. Under the circumstances, it is unnecessary to discuss Eccleston's assignments of error, since the assigned errors involve aspects of a case which should not have been submitted to the jury in the first instance.

REVERSED AND REMANDED WITH DIRECTION.