HAMAKO I. HAMILTON, APPELLEE, V.
DR. HAROLD R. BARES, APPELLANT.
678 N.W.2d 74

Filed April 16, 2004.    No. S-02-1475.

Mark E. Novotny and Shun Lee Fong, of Lamson, Dugan & Murray, L.L.P., for appellant.

Mandy L. Strigenz and E. Terry Sibbernsen, of E. Terry Sibbernsen, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Hamako I. Hamilton brought this medical malpractice action against Dr. Harold R. Bares, alleging that she suffered damages resulting from Bares' treatment of her vision problems. The district court overruled motions for directed verdict made by both parties. The jury was unable to reach a verdict, and the court declared a mistrial. The court overruled Bares' motions for new trial and for judgment notwithstanding the verdict, and Bares appeals.

## SCOPE OF REVIEW

■ On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence. *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 629 N.W.2d 511 (2001).

■ In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Saberzadeh v. Shaw*, 266 Neb. 196, 663 N.W.2d 612 (2003).

## FACTS

In the summer of 1997, Hamilton sought medical attention for vision problems in her right eye. She consulted with Bares, an ophthalmologist practicing in Bellevue, Nebraska. Bares advised her that she required cataract surgery. Hamilton underwent such surgery on August 7. Bares reported that the surgery was successful and that she could expect a full recovery in approximately 6 weeks. At that time, she would be given a new prescription for eyeglasses.

Following surgery, Hamilton suffered from decreased visual clarity, abnormal drooping and closure of the eye, and excessive watering of the eye, for which Bares prescribed a pain reliever and

antibiotic eye drops. He took x rays of Hamilton's eye and advised her that there was bleeding surrounding the retina which caused the decreased vision and excessive watering and that the condition would improve over time. Bares told her that laser treatment to attempt to stop the bleeding would be risky and could cause further damage to her vision.

On January 30, 1998, Hamilton went to Bares for a followup appointment, at which time Bares performed a capsulotomy. In her petition, Hamilton alleged that her right eye became more distressed and that she had diminished visual ability after the capsulotomy. She also alleged that Bares performed the procedure without proper advance notice to her, denying her the opportunity to obtain a second opinion. Hamilton continued to see Bares until November 1998, when she sought alternative medical attention.

Hamilton brought suit in August 1999, asserting that Bares had breached his duty to her. She alleged that Bares had negligently failed to conduct an adequate examination of her right eye and failed to perform diagnostic tests on her eye. She claimed that Bares failed to note and treat an existing retinal problem, negligently performed the cataract surgery and capsulotomy, and failed to advise her of the risks to her retina during cataract surgery.

At trial, Dr. Frederick Mausolf, an ophthalmologist who practices in Lincoln, Nebraska, testified as an expert for Hamilton. Mausolf had examined Hamilton in November 1998 and observed that she had "severe surface wrinkling with fibrosis at the macula on the right side," meaning that the inner layer of the retina was wrinkled. Mausolf told her that the only treatment available was surgery to remove the membrane and smooth out the retina.

From his review of Hamilton's medical records, Mausolf noted that her vision was 20/60 prior to the cataract surgery and that it decreased dramatically after the surgery. He also noted that in 1995, Hamilton had been seen at the Offutt Air Force Base hospital, and the records indicated that she had "macular pucker secondary to retina ERM, epiretinal membrane," a condition where the surface of the retina is wrinkled. Mausolf testified that he saw no mention or diagnosis of epiretinal membrane in the medical records made by Bares.

Mausolf was asked whether he had an opinion within a reasonable degree of medical certainty as to whether Bares had

followed the standard of care required for an ophthalmologist practicing in Bellevue on August 1, 1997. Following a relevancy objection that was overruled, Mausolf gave his opinion that the epiretinal membrane was not seen, noted, or taken into account prior to the cataract surgery, and he opined that Hamilton "wasn't given proper informed consent regarding the epiretinal membrane in order to make an informed decision as to whether to proceed with the cataract surgery or not." Mausolf stated that the cataract was of enough clarity that the epiretinal membrane could have been seen.

Mausolf testified that Hamilton should have been informed that she had two problems causing visual loss, the cataract and the epiretinal membrane, and that removing the cataract alone would not compensate for the loss of vision due to the epiretinal membrane. He found no evidence in the records he reviewed to indicate that she was informed about the epiretinal membrane.

Mausolf was asked if, in his opinion, Bares had breached the standard of care for an ophthalmologist practicing in Bellevue based on his failure to provide Hamilton with sufficient information to permit her to make an informed decision whether to have the cataract surgery. Mausolf stated that "it was required of the doctor to do a complete examination to find out the possible causes for her visual loss." Mausolf opined that Hamilton should have been informed that her visual loss was "partially due to the epiretinal membrane disease and due to the cataract." This information could have been taken into consideration in deciding whether to have the cataract removed. Mausolf said he did not see in the records that Bares discussed with Hamilton any alternative methods of treatment.

Hamilton's visual acuity was 20/80 when Mausolf saw her in November 1998 and when he saw her again in June 2001. In September 2001, her visual acuity was 20/200. Mausolf stated to a reasonable degree of medical certainty that the cataract surgery aggravated Hamilton's preexisting epiretinal membrane condition and caused her vision to further decrease.

Dr. Ira Priluck, an ophthalmologist in Omaha, Nebraska, testified for Bares. Priluck specialized in retinal problems and performed retinal surgeries. Priluck said that Hamilton came to him for a second opinion concerning her retinal problem and that he

recommended additional surgery, but she refused. Priluck testified to a reasonable degree of medical certainty that he believed Bares met the standard of care in diagnosing the retinal problem before cataract surgery and in advising Hamilton as to the risks, complications, and benefits of the cataract surgery.

Priluck testified that many patients do not remember having given informed consent prior to eye surgery, an issue which he has studied and about which he has published articles. Priluck's studies showed that about 80 percent of the patients remembered being told about the positive aspects of the surgery, while almost 80 percent denied they were ever told about the possibility of a bad outcome. Priluck said that because Hamilton's macular problem existed previously, her diminished vision would not have been caused by Bares' failure to diagnose the epiretinal membrane prior to surgery or his failure to obtain informed consent.

Dr. Gerald Christensen, an ophthalmologist who also testified for Bares, said that he was familiar with the generally accepted standard of care for ophthalmologists in the Sarpy County area as to the diagnosis, treatment, and informed consent related to cataracts, macular problems, and epiretinal membranes. To a reasonable degree of probability or medical certainty, Christensen said he believed that Bares met the appropriate standard of care in advising Hamilton of her retinal problem prior to surgery and that Bares met the standard of care in advising Hamilton of the risks of cataract surgery prior to the procedure.

Both parties made motions for directed verdict during trial that were overruled by the district court. The motions were renewed at the close of all the evidence and were again overruled. The jury was unable to reach a verdict, and a mistrial was declared. Bares subsequently filed motions for new trial and for judgment notwithstanding the verdict. The motions were overruled, and Bares filed this appeal.

## ASSIGNMENTS OF ERROR

Bares asserts that the district court erred in overruling his motions for directed verdict, for new trial, and for judgment notwithstanding the verdict.

## ANALYSIS

We first note that we have jurisdiction over this appeal pursuant to Neb. Rev. Stat. § 25-1315.02 (Cum. Supp. 2002), which authorizes an appeal from the denial of a judgment notwithstanding the verdict after the jury has been discharged as the result of an inability to reach a verdict. See *Snyder v. Contemporary Obstetrics & Gyn.*, 258 Neb. 643, 605 N.W.2d 782 (2000).

In a malpractice action involving professional negligence, the burden of proof is upon the plaintiff to demonstrate the generally recognized medical standard of care, that there was a deviation from that standard by the defendant, and that the deviation was a proximate cause of the plaintiff's alleged injuries. *Neill v. Hemphill*, 258 Neb. 949, 607 N.W.2d 500 (2000). The plaintiff must prove each essential element of the claim asserted by a preponderance of the evidence. *Snyder v. Contemporary Obstetrics & Gyn., supra.* A defendant's negligence is not actionable unless it is a proximate cause of the plaintiff's injuries or is a cause that proximately contributed to them. *Id.* Proximate causation requires proof necessary to establish that the physician's deviation from the standard of care caused or contributed to the injury or damage to the plaintiff. *Id.*

Bares argues that Hamilton did not prove that he deviated from the standard of care or that his actions were a proximate cause of the alleged injury to Hamilton. We have held that ordinarily, in a medical malpractice case, the plaintiff must prove the physician's negligence by expert testimony. *Walls v. Shreck*, 265 Neb. 683, 658 N.W.2d 686 (2003). Thus, in order to meet the burden of proof, Hamilton was required to present expert testimony establishing that Bares did not meet the standard of care and that his actions proximately caused Hamilton's injury.

Because this case concerns informed consent, we first consider whether Mausolf's testimony was sufficient to demonstrate that Bares failed to obtain informed consent from Hamilton prior to the cataract surgery and, therefore, failed to meet the standard of care required in Bellevue.

Informed consent is defined in state law as follows:

> Informed consent shall mean consent to a procedure based on information which would ordinarily be provided to the patient under like circumstances by health care providers

engaged in a similar practice in the locality or in similar localities. Failure to obtain informed consent shall include failure to obtain any express or implied consent for any operation, treatment, or procedure in a case in which a reasonably prudent health care provider in the community or similar communities would have obtained an express or implied consent for such operation, treatment, or procedure under similar circumstances.

Neb. Rev. Stat. § 44-2816 (Reissue 1998).

The statute refers to the locality standard in two phrases: "in the locality or in similar localities" and "in the community or similar communities." *Id*. It is apparent that the Legislature intended that the question of the appropriate standard of care regarding informed consent could be addressed by physicians familiar with medical treatment in similar localities or communities, and not necessarily by only those physicians in the same locality or community in which the alleged malpractice occurred.

Bares asserts that although Mausolf testified that the standard of care regarding informed consent in Bellevue was not met, his opinion should be disregarded due to lack of foundation. Bares' objection to the opinion on the basis of relevance was overruled. Bares argues that Hamilton's expert, Mausolf, did not know the standard of care for informed consent in Bellevue because he practiced in Lincoln and that, therefore, Hamilton has not shown that Bares deviated from the standard of care in Bellevue.

We have previously addressed the standard of care for informed consent. In *Eccleston v. Chait*, 241 Neb. 961, 492 N.W.2d 860 (1992), this court noted that two theories have been developed concerning the extent of a physician's duty to disclose risks of a particular treatment or procedure: the "material risk theory" and the "professional theory." We held that the adoption of § 44-2816 committed the citizens of Nebraska to abide by the professional theory, " 'under which expert evidence is indispensable to establish what information would ordinarily be provided under the prevailing circumstances by physicians in the relevant and similar localities.' " *Eccleston v. Chait*, 241 Neb. at 968, 492 N.W.2d at 864, quoting *Smith v. Weaver*, 225 Neb. 569, 407 N.W.2d 174 (1987).

In *Robinson v. Bleicher*, 251 Neb. 752, 559 N.W.2d 473 (1997), Charles and Josephine Robinson proffered the testimony

of one expert regarding the issue of informed consent. The expert had no experience in Lincoln or anywhere else in Nebraska, and the trial court refused to allow the expert to testify. The Robinsons cited *Capps v. Manhart*, 236 Neb. 16, 458 N.W.2d 742 (1990), for the proposition that a medical expert from one medical community is competent to testify as an expert witness as to the standard of care or skill required in another community if the expert has knowledge of or familiarity with the practice and standard of the locality or a similar community. We stated that since the Robinsons' action was based upon a lack of informed consent, the locality standard was applicable and the rule set forth in *Capps* was not applicable. We concluded that the expert witness had no knowledge "with respect to the standard of informed consent in Lincoln on March 24, 1988," and that it was not an abuse of discretion for the district court to exclude his testimony. *Robinson v. Bleicher*, 251 Neb. at 760, 559 N.W.2d at 479.

Our decision in *Robinson* may be interpreted to be in conflict with § 44-2816. The comment to NJI2d Civ. 12.03 states that *Robinson* created a conflict with § 44-2816 and disagrees with previous cases that used a same-or-similar-locality standard. It goes on to state that the rule from *Robinson* provides that in an informed consent case, the standard of the reasonable medical practitioner is the prevailing standard of the locality in question, and not " 'the locality in question *or a similar or like community*,' " as provided in § 44-2816. See NJI2d Civ. 12.03 comment at 799.

More recently, this court considered the locality standard in *Walls v. Shreck*, 265 Neb. 683, 658 N.W.2d 686 (2003). Therein, we reviewed the evidence to determine whether the plaintiff had established by expert testimony the standard of care in North Platte, Nebraska, and similar communities for obtaining informed consent and whether there was sufficient evidence to establish that the physician had violated the standard.

In *Walls*, the plaintiff met with the physician in his office to discuss strabismus surgery on the plaintiff's left eye. During surgery, the physician found excessive scar tissue on the left eye and elected to adjust the muscles of the right eye instead. The patient subsequently experienced problems with the right eye and sued the physician for medical malpractice. The surgery was

conducted in North Platte, and at trial, an ophthalmologist from Scottsbluff, Nebraska, testified on behalf of the plaintiff. This witness testified that informed consent was required ethically " 'in our country.' " *Id.* at 688, 658 N.W.2d at 691. We found that this testimony established the standard of care in North Platte and similar communities.

In order to resolve any perceived conflict among *Robinson v. Bleicher*, 251 Neb. 752, 559 N.W.2d 473 (1997); other informed consent cases; and § 44-2816, we hold that a physician's duty to obtain informed consent is measured by what information would ordinarily be provided to the patient under like circumstances by health care providers engaged in a similar practice in the locality or in similar localities. This language mirrors the provisions of § 44-2816. To the extent that *Robinson* can be interpreted to conflict with § 44-2816 and the same-or-similar-locality standard regarding informed consent, that interpretation is disapproved.

In the case at bar, Bares' practice was in Bellevue. Hamilton's expert witness who testified as to the standard of care regarding informed consent was an ophthalmologist practicing in Lincoln. The witness testified that Bares had breached the standard of care for an ophthalmologist practicing in Bellevue based on his failure to provide Hamilton with sufficient information to permit her to make an informed decision regarding whether to have the cataract surgery. Therefore, Hamilton offered evidence concerning the standard of care in Bellevue.

Section 44-2816 specifies that the standard of care regarding informed consent is based on the practice of health care providers engaged in a similar practice in the locality or similar localities. We conclude that it is reasonable to infer that the cities of Bellevue and Lincoln are similar localities.

On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence. *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 629 N.W.2d 511 (2001). Assuming the truth of all relevant evidence which is favorable to Hamilton and giving

her the benefit of all proper inferences therefrom, we conclude that Mausolf's testimony was sufficient to show that Bares deviated from the generally recognized medical standard of care.

We must then consider whether Hamilton offered expert testimony that the deviation was a proximate cause of her alleged injury. See *Walls v. Shreck*, 265 Neb. 683, 658 N.W.2d 686 (2003). Mausolf stated that Hamilton's medical records showed that she was seen at the Offutt hospital in 1995, prior to the cataract surgery, and found to have "macular pucker secondary to retina ERM, epiretinal membrane," a condition where the surface of the retina is wrinkled. The cataract surgery was performed in August 1997. When Mausolf saw Hamilton in November 1998, her visual acuity was 20/80. In June 2001, it remained 20/80. By September 2001, her visual acuity was 20/200. Mausolf opined that the cataract surgery aggravated Hamilton's preexisting epiretinal membrane condition and caused her vision to further deteriorate. This evidence, if believed by the finder of fact, would satisfy Hamilton's burden to show that the cataract surgery was a proximate cause of her injury.

Bares also claims that the district court should have granted his motion for a directed verdict at the close of all the evidence. In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Saberzadeh v. Shaw*, 266 Neb. 196, 663 N.W.2d 612 (2003). A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, when an issue should be decided as a matter of law. *Williams v. Allstate Indemnity Co.*, 266 Neb. 794, 669 N.W.2d 455 (2003). At the close of evidence, it was possible for reasonable minds to differ as to whether Hamilton had met the burden of proof to establish medical malpractice. Thus, the court did not abuse its discretion in failing to grant Bares' motion for directed verdict.

## CONCLUSION

The district court did not abuse its discretion in failing to grant Bares' motions for directed verdict, for new trial, and for judgment notwithstanding the verdict. The judgment of the district court is affirmed, and the cause is remanded for further proceedings.

AFFIRMED AND REMANDED FOR
FURTHER PROCEEDINGS.