MATTHEW CURRAN AND EMILY CURRAN, HUSBAND AND WIFE,
APPELLANTS, V. KERREY B. BUSER, APPELLEE.

711 N.W.2d 562

Filed March 31, 2006. No. S-04-1303.

E. Terry Sibbernsen and Andrew D. Sibbernsen, of Sibbernsen & Strigenz, P.C., for appellants.

Joseph S. Daly and Michael G. Monday, of Sodoro, Daly & Sodoro, P.C., for appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Appellants, Matthew Curran and Emily Curran, sued Matthew's surgeon, appellee, Kerrey B. Buser, for medical malpractice, because of complications arising after Buser removed Matthew's gallbladder. Before Matthew's surgery, the Department of Health and Human Services Regulation and Licensure disciplined Buser for "unprofessional conduct" and restricted his surgical privileges for 1 year. Nine days after the year had passed, Buser operated on Matthew. The Currans sued Buser, alleging both negligence and lack of informed consent. The Currans wanted to introduce evidence of Buser's disciplinary history. Buser filed a

motion in limine, prohibiting mention of his disciplinary issues, which the trial court granted. The jury found for Buser on the negligence issue, and the Currans appeal only the court's ruling on the motion in limine.

The Currans ask us to apply a different standard of care to informed consent cases involving a doctor's disciplinary history. Because the Legislature adopted the professional theory as governing the standard of care in all informed consent cases, we affirm the trial court's decision.

## BACKGROUND

In February 2001, after suffering abdominal pains, Matthew sought assistance from general practitioner Gregory Kloch. After an ultrasound revealed abnormalities in Matthew's gallbladder, Kloch referred Matthew to Buser. On February 13, Buser diagnosed Matthew as having an inflamed gallbladder. Buser told Matthew he needed to remove the gallbladder as soon as possible, using a procedure called laparoscopic cholecystectomy. Later on that date, Buser performed the surgery.

After the surgery, Matthew experienced complications, and Buser performed another surgery on him 6 days later. Buser discovered that a suture from the earlier surgery had come loose, so he inserted a "T-tube." When Matthew complained of bile drainage at the site of the "T-tube," Kloch recommended that Matthew go to a hospital in Omaha, Nebraska, for further treatment. While there, Matthew had numerous corrective surgeries and experienced prolonged pain, fatigue, nausea, and depression, although these conditions have gradually improved.

After the surgery, the Currans sued Buser for negligence. During discovery, the Currans obtained photocopies of the Department of Health and Human Services Regulation and Licensure disciplinary order that restricted Buser's surgical privileges. The Currans alleged that Buser negligently performed the surgeries and failed to obtain informed consent.

Before trial, Buser moved in limine to prevent the Currans from mentioning the disciplinary action. Buser claimed that the disciplinary proceedings were irrelevant and that any probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

On the motion in limine, the court admitted the following evidence: The day of Matthew's first surgery, Buser sent a letter to Kloch, stating: "The patient is aware of the [State Board of Health] issue and declines referral to another surgeon." In Buser's deposition, he explained the disclosure as follows:

A. You know, I don't know if I went into the details of the exact restrictions of [the disciplinary order]. What I more than likely told him was that I was the doctor that was accused of being a bad doctor in the newspapers and was sanctioned by the medical board.

The other thing that I said was that if any of that bothers you or anything that you've read or heard, if you want to talk about it or if you want to go to another surgeon, that's fine, we'll be happy to arrange that.

Buser also testified in his deposition that he thought he told Matthew that the State Board of Health wanted to "pull" his license. Buser said that he believed his own standard of care required that he tell Matthew about the disciplinary action, but that he was not sure that the majority of surgeons feel obligated to do so. He said he explained to Matthew "the gist" of what he thought Matthew would want to know.

By contrast, the Currans, in their depositions, refute Buser's recollection, claiming that they learned of the disciplinary issues after the surgery and that Buser never indicated they could get a second opinion. The trial court sustained Buser's motion in limine.

At the beginning of the trial, the Currans made an offer of proof regarding Buser's disclosure of his disciplinary actions. In the offer of proof, the Currans sought to admit photocopies of disciplinary actions against Buser from both Minnesota and Nebraska. The Minnesota action restricted Buser's surgical practice, finding a "clustering of major laparoscopic complications," arising from "inappropriate" practices in the treatment of 13 different patients between 1992 and 1994. In the Nebraska disciplinary action, the chief medical officer recognized the Minnesota action and found clear and convincing evidence of "unprofessional," but not negligent, conduct in four new cases.

The court denied the offer of proof, citing *Hamilton v. Bares*, 267 Neb. 816, 678 N.W.2d 74 (2004), as requiring expert

testimony about the standard of care in informed consent cases. The court stated that the Currans' evidence could still be admitted if an expert testified that the standard of care required disclosure of disciplinary proceedings. No such expert testified, and the jury never heard the disciplinary evidence. The jury returned a verdict for Buser on the negligence issue. The Currans appeal only the trial court's order sustaining Buser's motion in limine.

## ASSIGNMENT OF ERROR

The Currans assign that the trial court erred by sustaining Buser's motion in limine, disallowing them to introduce evidence of Buser's disciplinary action and his failure to inform Matthew of that action.

## STANDARD OF REVIEW

■ When reviewing a question of law, an appellate court resolves the question independently of the conclusion reached by the trial court. *In re Grand Jury of Lancaster Cty.*, 269 Neb. 436, 693 N.W.2d 285 (2005).

■ In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. See *In re Interest of B.R. et al.*, 270 Neb. 685, 708 N.W.2d 586 (2005).

■ Also, because the exercise of judicial discretion is implicit in determinations of relevancy and admissibility under Neb. Rev. Stat. §§ 27-401 and 27-403 (Reissue 1995), the trial court's decision will not be reversed absent an abuse of discretion. *Gerhold Concrete Co. v. St. Paul Fire & Marine Ins.*, 269 Neb. 692, 695 N.W.2d 665 (2005). An abuse of discretion occurs when the trial judge's reasons or rulings are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Holden v. Wal-Mart Stores*, 259 Neb. 78, 608 N.W.2d 187 (2000).

## ANALYSIS

The Currans do not contend that Matthew was not made aware of all the risks of the procedure. The thrust of the Currans' argument is that Buser operated on Matthew without informed consent because Buser failed to inform him of his disciplinary history. The Currans urge this court to apply the material risk theory to informed consent cases when the omitted information relates to the doctor's disciplinary history. They (1) argue that the statute embraces material risk principles; (2) in the alternative, ask us to carve out a special exception; and (3) contend that the trial court improperly excluded their evidence because it was relevant, not unduly prejudicial, and admissible for impeachment purposes.

*Difference Between Professional Theory and Material Risk Theory.*

Informed consent concerns a doctor's duty to inform his or her patient of the risks involved in treatment or surgery. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 32 (5th ed. 1984). Although initially treated as a battery action, modern courts recognize it as a negligence action hinging on the standard of professional conduct. See *id.* Regarding the sufficiency of the information, we have stated:

> "Surgeons and other doctors are . . . required to provide their patients with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of treatment or surgical procedure. Such a disclosure should include the nature of the pertinent ailment or condition, the risks of the proposed treatment or procedure, and the risks of any alternative methods of treatment, including the risks of failing to undergo any treatment at all. Thus, although the procedure be skillfully performed, the doctor may nevertheless be liable for an adverse consequence about which the patient was not adequately informed."

*Eccleston v. Chait*, 241 Neb. 961, 967, 492 N.W.2d 860, 864 (1992) (quoting Keeton et al., *supra*). When determining what information a patient needs to make an informed decision, jurisdictions have generally split between two different theories: the

professional theory and the material risk theory. We have explained the difference between the theories as follows:

> The "professional" theory holds that the duty is measured by the standard of the reasonable medical practitioner under the same or similar circumstances, and must be determined by expert medical testimony establishing the prevailing standard and the defendant practitioner's departure therefrom. On the other hand, the "material risk" theory holds the duty to disclose is measured by the patient's need for information to balance the probable risks against the probable benefits in making the decision to either undergo or forgo the treatment proposed. Although under this theory expert medical testimony may be necessary to establish the undisclosed risk as a known danger of the procedure, expert testimony is not required to establish the physician's duty to disclose, and the fact finder can decide, without the aid of a medical expert, whether a reasonable person in the patient's position would have considered the risk significant in making his or her decision.

*Smith v. Weaver*, 225 Neb. 569, 573-74, 407 N.W.2d 174, 178 (1987).

*Nebraska Legislature Codified Informed Consent Doctrine, Adopting Professional Theory to Govern Standard of Care.*

The professional theory is firmly entrenched in Nebraska law; we have both statutory provisions and case law adopting the doctrine. First, Neb. Rev. Stat. § 44-2816 (Reissue 2004) defines informed consent:

> Informed consent shall mean consent to a procedure based on information which would ordinarily be provided to the patient under like circumstances by health care providers engaged in a similar practice in the locality or in similar localities. Failure to obtain informed consent shall include failure to obtain any express or implied consent for any operation, treatment, or procedure in a case in which a reasonably prudent health care provider in the community or similar communities would have obtained an express or implied consent for such operation, treatment, or procedure under similar circumstances.

Moreover, Neb. Rev. Stat. § 44-2820 (Reissue 2004) provides the burden of proof in an action based on failure to obtain informed consent. It states:

> Before the plaintiff may recover any damages in any action based on failure to obtain informed consent, it shall be established by a preponderance of the evidence that a reasonably prudent person in the plaintiff's position would not have undergone the treatment had he or she been properly informed and that the lack of informed consent was the proximate cause of the injury and damages claimed.

This court has routinely determined that "notwithstanding voluminous criticism of the professional theory of informed consent, [we are] bound by § 44-2816 as a statutory standard and prescription for an informed consent." *Eccleston v. Chait,* 241 Neb. 961, 968, 492 N.W.2d 860, 864 (1992). See, also, *Robinson v. Bleicher,* 251 Neb. 752, 559 N.W.2d 473 (1997), *disapproved on other grounds, Hamilton v. Bares,* 267 Neb. 816, 678 N.W.2d 74 (2004); *Jones v. Malloy,* 226 Neb. 559, 412 N.W.2d 837 (1987); *Smith v. Weaver, supra.*

Nonetheless, the Currans point to the dissent in *Smith v. Weaver, supra,* which argued that § 44-2820 committed this state to the material risk theory. In doing so, the Currans argue that the statutory language does not support our adherence to the professional theory, but embraces material risk principles.

But statutes relating to the same subject matter will be construed so as to maintain a sensible and consistent scheme, giving effect to every provision. See *In re Application of Metropolitan Util. Dist.,* 270 Neb. 494, 704 N.W.2d 237 (2005). And an appellate court will, if possible, try to avoid a statutory construction which would lead to an absurd result. *Nicholson v. General Cas. Co. of Wis.,* 262 Neb. 879, 636 N.W.2d 372 (2001). The approach urged here would lead to an absurd result insofar as the Currans argue that § 44-2816 adopts the professional theory, while § 44-2820 adopts the material risk theory. If this were the case, we would have two mutually exclusive standards governing a doctor's duty to inform his or her patient.

Instead, we read §§ 44-2816 and 44-2820 together. Doing so demonstrates that the Nebraska Legislature adopted the professional theory for its standard of care and the evidence

required to prove the standard of care and that it adopted a two-prong test for causation. The first prong uses an objective standard to evaluate the plaintiff's decision to forgo the surgery, while the second requires proof that the lack of informed consent proximately caused the injury and damages. Although our statutory framework is somewhat unique, we note that other professional theory jurisdictions also use objective standards for causation. See, e.g., *Funke v. Fieldman*, 212 Kan. 524, 512 P.2d 539 (1973).

 Under §§ 44-2816 and 44-2820, consent is informed when a doctor advises a patient of the risks in the same manner as doctors in similar localities and under similar circumstances ordinarily would. However, before a plaintiff may recover any damages sustained, the plaintiff must prove by a preponderance of the evidence that a reasonably prudent person in the plaintiff's position would not have undergone the treatment if he or she were "properly informed" and that his or her injuries were proximately caused by the lack of informed consent. Although § 44-2820 does not define proper information, when read in conjunction with § 44-2816, a patient must be properly informed under § 44-2816.

Under this framework, the Currans must first prove by expert testimony that doctors in similar locations and situations would ordinarily disclose their disciplinary history. After establishing the standard of care, the Currans must next prove that Buser deviated from that standard. To prove causation, the Currans must prove both that a reasonable person in their situation would have refused the surgery if Buser had properly informed them under the standard and that the lack of information proximately caused the injury sustained and damages alleged. The statute's requirements are cumulative; thus, in order to proceed to the next step, the plaintiff must prove the one before it.

Here, Buser was the only doctor to testify about the standard of care in the locality. He said that although it was his personal practice to inform his patients of the recent disciplinary action, "I don't know if the majority feel that they are obligated to do that." Although Buser's testimony does not decisively state that most doctors would not feel obligated to disclose their disciplinary

history, it is the plaintiff's burden to prove the standard of care. Thus, the Currans failed to prove that the standard of care required Buser to disclose his disciplinary history.

*Under Professional Theory, Doctor's Personal Standard of Care Does Not Establish Standard of Care.*

Nonetheless, the Currans point out that Buser said his personal standard of care required him to disclose his disciplinary history. They ask us to hold Buser to his own standard of care. But as we said in *Eccleston v. Chait*, 241 Neb. 961, 969, 492 N.W.2d 860, 865 (1992), a doctor's "personal standard regarding information for a patient's consent is irrelevant." Under the professional theory, the standard of care in medical malpractice cases for informed consent is not determined by the doctor's personal or customary routine, but on the information doctors ordinarily supply to patients in similar circumstances and locations. Here, Buser was the only doctor to testify about the standard of care for informed consent. He explained that although it was his practice to inform his clients about the disciplinary action, he was not sure that most doctors would do so.

However, if a doctor chooses to provide more information than similarly situated practitioners ordinarily would—adopting a higher standard of care—the doctor should not be penalized for straying from that higher standard as long as the doctor does not drop below the community's standard of care. Holding doctors to their personal standard of care when that personal standard exceeds the community standard would discourage doctors from exceeding the community standard and encourage blind conformity.

Although the Legislature bound the state to the professional theory, we have frequently reiterated that the professional theory " 'paternalistically leaves the right of choice to the medical community, in derogation of the patient's right to self-determination.' " *Eccleston v. Chait*, 241 Neb. at 968, 492 N.W.2d at 864 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 32 (5th ed. 1984)). Thus, we do not wish to discourage doctors from providing a patient more information than the community standard requires and we refuse to do so here.

*We Decline to Carve Out Material Risk Exception for
Cases When Omitted Information Relates to
Doctor's Disciplinary History.*

Although the Currans acknowledge that in Nebraska, the professional theory governs informed consent, they argue that their case is distinguishable from the "typical claim for failure to obtain informed consent," brief for appellants at 16, and that thus, the material risk theory should govern. They contend their case warrants an exception because Matthew was insufficiently informed about the doctor's disciplinary history, not about the operation itself. And when the unwarned risk relates to a doctor's disciplinary history, we should apply the material risk theory—asking whether a reasonable person would consider that information material, not whether ordinary doctors would disclose that information. Although enticing, we decline the invitation.

Our research could not uncover precedent for defining the standard of care differently depending on the kind of risks involved. Although other jurisdictions have questioned what role a doctor's experience should play in the context of informed consent, they are unsurprisingly split on the issue. Some courts adopt a bright-line rule requiring disclosure of treatment risks, but not of a doctor's experience. See, *Duttry v. Patterson*, 565 Pa. 130, 771 A.2d 1255 (2001); *Whiteside v. Lukson*, 89 Wash. App. 109, 947 P.2d 1263 (1997). Others require doctor-related disclosures only when mandated by the standard of care. See, *Duffy v. Flagg*, 88 Conn. App. 484, 869 A.2d 1270 (2005); *Tashman v. Gibbs*, 263 Va. 65, 556 S.E.2d 772 (2002); *Johnson v. Kokemoor*, 199 Wis. 2d 615, 545 N.W.2d 495 (1996); *Arato v. Avedon*, 5 Cal. 4th 1172, 858 P.2d 598, 23 Cal. Rptr. 2d 131 (1993).

The evidence proffered here would not be required under either approach. The Currans plainly limit their claim to warnings about Buser's disciplinary history, not the operation. The Currans never established that the standard of care required such disclosures. Rather, they ask us to adopt a different standard of care for a narrow class of plaintiffs. Not only is their approach unprecedented, it contravenes the Legislature's adoption of the professional theory by supplanting, in a single narrow context, the Legislature's judgment.

■ Instead, our statutes comport with an approach that requires doctor-related disclosures only when mandated by the standard of care. Under § 44-2816, informed consent means "consent to a procedure based on information which would ordinarily be provided to the patient under like circumstances by health care providers engaged in a similar practice in the locality or in similar localities." While the Currans ask us to distinguish treatment risks from doctor-related risks, § 44-2816 does not make this distinction. It asks only whether similarly situated doctors would ordinarily provide the information.

■ We give statutory language its plain and ordinary meaning and will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. See *McCray v. Nebraska State Patrol, ante* p. 1, 710 N.W.2d 300 (2006). The language of the statute is unambiguous, and we are bound by it. Under § 44-2816, a doctor's disciplinary history, like other doctor-related risks, is required only when mandated by the standard of care.

As in the past, we recognize that the professional theory "places a patient, who more than likely lacks a medical background or training, in the precarious position of exploring and inquiring about adverse consequences of a surgical procedure." *Eccleston v. Chait*, 241 Neb. 961, 969, 492 N.W.2d 860, 865 (1992). Nonetheless, we do not write on a blank slate; the Legislature adopted the professional theory in § 44-2816, and its language binds this court to that theory.

*The Currans' Evidence Was Properly Excluded Because Trial Court Did Not Abuse Its Discretion When Finding It Inadmissible.*

■ The Currans next argue that the excluded evidence is admissible under the Nebraska rules of evidence because it is relevant, not unduly prejudicial, and admissible for impeachment purposes. Under § 27-401, relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Under Neb. Rev. Stat. § 27-402 (Reissue 1995), evidence which is not relevant is not admissible. *Holden v. Wal-Mart Stores*, 259

Neb. 78, 608 N.W.2d 187 (2000). Moreover, under § 27-403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Because we continue to adhere to the professional theory, the question is, What is the standard of care—what information do doctors in similar localities ordinarily give patients under similar circumstances? Here, the Currans failed to prove that the standard of care required Buser to disclose his disciplinary history. Thus, any evidence about Buser's disciplinary history is irrelevant to their informed consent claim.

Although the Currans argue that the evidence excluded is relevant to whether Matthew "would have allowed Buser to perform the recommended surgical operation," brief for appellants at 22, this misreads the statute. The Currans argue that the information is relevant to the first prong of the causation analysis required by § 44-2820. But § 44-2820 asks whether "a reasonably prudent person in the plaintiff's position would . . . have undergone the treatment *had he or she been properly informed.*" (Emphasis supplied.) As discussed above, §§ 44-2816 and 44-2820, when read together, suggest that proper information means properly informed under the professional theory which asks, What information do doctors in similar localities ordinarily give patients under similar circumstances? Because the record lacks expert testimony that the standard of care required disciplinary disclosures, the proffered evidence is also irrelevant to causation.

Finally, the Currans argue that the court should have admitted Buser's disciplinary history to impeach his credibility. But this court has said that witnesses can only be impeached as to matters that are not collateral—matters that are independently provable. *Jones v. Tranisi*, 212 Neb. 843, 326 N.W.2d 190 (1982). In *Jones*, this court upheld a jury verdict in a medical malpractice case. The plaintiff sued her doctor, claiming he negligently performed her thyroidectomy, impairing her vocal cords and leaving her permanently hoarse. On cross-examination, the doctor testified that no patient upon whom he had performed

a thyroidectomy complained of losing his or her voice after the operation.

The plaintiff tried to introduce evidence that a former patient of the defendant experienced similar adverse consequences after the defendant performed the same surgery on her. We refused to admit rebuttal evidence proffered by the plaintiff, stating that if the plaintiff was offering the evidence to prove the doctor's negligence in performing the operation on the plaintiff, it was not relevant for that purpose because one cannot prove negligence by demonstrating merely that the defendant acted negligently in the past. We further stated that the evidence was inadmissible for impeachment because it related to a collateral matter. " '[F]acts which would have been independently provable regardless of the contradiction are not "collateral." . . . "It is only as to matters relevant to some issue involved in a case that a witness can be contradicted for the purpose of impeachment." . . .' " *Id.* at 846, 326 N.W.2d at 192.

Although Buser and the Currans dispute whether Buser warned them about his disciplinary record, the dispute involves evidence that is irrelevant under the professional theory. Moreover, the trial court recognized that the proffered evidence implicates both §§ 27-401 and 27-403. While the parties' dispute may be marginally relevant to credibility, its probative value is outweighed by the dangers described in § 27-403. We conclude that the trial court did not abuse its discretion when excluding the Currans' evidence.

CONCLUSION

To carry out the Legislature's intent, we decline to distinguish doctor-related risks from other treatment risks. Moreover, the Currans failed to demonstrate that the standard of care in similar communities required Buser to disclose his disciplinary history; thus, the trial court did not abuse its discretion by sustaining the motion in limine. The trial court's decision is affirmed.

AFFIRMED.

WRIGHT, J., not participating.