CITY OF ELKHORN, NEBRASKA, A MUNICIPAL CORPORATION, ET AL.,
APPELLANTS AND CROSS-APPELLEES, V. CITY OF OMAHA,
NEBRASKA, A MUNICIPAL CORPORATION, ET AL.,
APPELLEES AND CROSS-APPELLANTS.

725 N.W.2d 792

Filed January 12, 2007. No. S-05-1006.

Jeff C. Miller and Duncan A. Young, of Young & White, for appellants.

William M. Lamson, Jr., Lawrence F. Harr, and Craig F. Martin, of Lamson, Dugan & Murray, L.L.P., and Paul D. Kratz, Omaha City Attorney, and Alan M. Thelen for appellees.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

CONNOLLY, J.

The City of Omaha, Nebraska, and the City of Elkhorn, Nebraska, raced to pass ordinances to annex territories that would expand their respective boundaries. Omaha's ordinances sought to annex land that would make it contiguous and adjacent to Elkhorn, thus allowing Omaha to annex Elkhorn. Elkhorn's

annexation ordinance, on the other hand, sought to annex surrounding sanitary improvement districts (SIDs) to raise Elkhorn's population to over 10,000, which would immunize it from unilateral annexation by Omaha. See Neb. Rev. Stat. § 14-117 (Cum. Supp. 2006).

Despite Elkhorn's attempt to annex the SIDs without Omaha's knowledge, Omaha learned of Elkhorn's efforts, and the race was on. The pivotal issue is whether Omaha, in adopting its annexation ordinance, "jumped the gun" by violating the Open Meetings Act (the Act), Neb. Rev. Stat. §§ 84-1407 to 84-1414 (Reissue 1999 & Cum. Supp. 2004), thus voiding its ordinance. We conclude that (1) the district court correctly decided that Omaha did not violate the Act and (2) because Omaha, a metropolitan class city, had less statutory hurdles to overcome than Elkhorn, Omaha adopted its annexation ordinance first. We affirm.

## I. BACKGROUND

In April 2000, the U.S. Census Bureau estimated Elkhorn's population at 7,623. Beginning in the late 1990's, the Omaha Planning Department began studying the possible annexation of Elkhorn. Within a year or two after his June 2001 election, the Omaha mayor directed the planning department to plan for the annexation of Elkhorn. Omaha and Elkhorn then began having formal discussions about annexation. The cities did not resolve their differences.

### 1. ELKHORN IS OUT OF GATE FIRST

In October or November 2004, the Elkhorn mayor and Don Eikmeier, Elkhorn's city administrator, began looking at much broader annexations than the parcels recommended in Elkhorn's 2003 comprehensive plan. In addition to 8 parcels that were in the 2003 plan, their new plan called for annexing 13 additional SIDs that were not in that plan.

Some time before January 17, 2005, Eikmeier stated to the Omaha World-Herald newspaper that Elkhorn had no current annexation plans. Despite his work on an annexation plan for 2005, Eikmeier also stated that he was not aware of an annexation plan that Elkhorn would adopt before 2007. The Eikmeier interview was apparently triggered by the Omaha mayor's earlier

statement in an interview that Omaha's annexation of Elkhorn was inevitable. Eikmeier admitted that Elkhorn proceeded with its aggressive annexation plan to prevent Omaha from annexing Elkhorn. See § 14-117 (providing that metropolitan class cities can extend boundaries over land that includes or annexes city of first class with population less than 10,000).

Moving forward, on Monday, February 14, 2005, Elkhorn posted a special meeting notice at three locations: the city hall, the post office, and a bank. The notice provided that the council and mayor would meet in the public library on February 21 and that an agenda was available for inspection at the city clerk's office. The only item listed on the agenda was the street plan. On February 15, the Douglas County Post-Gazette newspaper published a notice of the special meeting that also provided that the street plan was on the agenda.

On Friday, February 18, 2005, at 1:50 p.m., Elkhorn added the annexation resolution to its special meeting agenda. The city clerk made a note of the addition in a notebook that was available to the public upon request, but an agenda was not printed until 4:55 p.m., after the city offices had closed. Eikmeier continued to work on the plan through Saturday, and on Sunday morning, he made copies for council members and faxed copies of the amended agenda to the Omaha World-Herald and Douglas County Post-Gazette newspapers. Elkhorn posted the amended agenda to its Web site on Saturday.

Elkhorn held its special meeting on February 21, 2005, President's Day, as planned. Less than 10 residents and a reporter from the Douglas County Post-Gazette attended. Eikmeier admitted that the holiday meeting was partially motivated by a desire to "beat Omaha to the punch" because of state laws favoring Omaha's annexation powers. Elkhorn was at a disadvantage because a city of the first class must adopt a specified annexation resolution and plan for extending services before annexing land. See Neb. Rev. Stat. § 16-117(3) (Reissue 1997). On the other hand, Omaha can extend its limits "at any time" by ordinance. § 14-117. At the February 21 meeting, Elkhorn adopted resolution No. 2005-08, its annexation resolution, and a plan to extend services to the designated areas. Elkhorn admitted that it did not hold a public meeting that day on its annexation actions.

## 2. Omaha Lags Behind

On the same day, Omaha's planning director learned about Elkhorn's annexation plans. The director stated that Elkhorn's plan surprised him because Eikmeier had publicly stated that Elkhorn did not have immediate annexation plans.

On Tuesday, February 22, 2005, Omaha prepared legal documents and ordinances to annex Elkhorn and began an extensive annexation report, detailing the necessity of the annexation and the cost of providing services to the annexed area. At 9:51 a.m., the Omaha mayor called a special meeting to be held at 10 o'clock that night. The meeting concerned Omaha's annexation plan for Elkhorn and specific SIDs and other properties to be annexed. The city clerk issued a call for the meeting and contacted all council members to verify where he could serve notice; none of the members objected to the meeting, and all of them signed the call within 1 hour. An agenda of the special meeting was faxed to 19 area media outlets between 10:16 and 10:54 a.m. Notice was also posted on bulletin boards in the city's offices and on its Web site. The Omaha World-Herald published an article about the meeting in its afternoon edition of the February 22 paper. All council members attended and made no objections to the meeting.

Before the special meeting on February 22, 2005, the Omaha Planning Department drafted two alternative ordinances for annexing Elkhorn and other areas: one included the Elk Valley subdivision, and the other did not. At the February 22 meeting, Omaha read the two ordinances for the first time.

## 3. Homestretch: Both Cities Race to Finish Line

Meanwhile, on February 22, 2005, Elkhorn published notice of a special meeting for March 1. On February 25, Omaha published notice of a public hearing and administrative meeting of the Omaha Planning Board for Wednesday, March 2. It also published notice of its precouncil briefing and regular city council meeting for March 1.

On Tuesday, March 1, 2005, Omaha held a public meeting at which it read the annexation ordinance for the second time. Omaha city department heads briefed every member of the Omaha City Council on the annexation issues in three nonpublic meetings conducted at 8:30, 9:30, and 11:30 a.m. No more

than three council members attended a briefing. The department heads' briefings occurred before and after the public precouncil meeting at 10:30 a.m. None of the council members asked questions about the annexation at the public precouncil meeting. Also, on March 1, Elkhorn published its annexation resolution and notice of a public meeting to be held on March 11 for consideration of its plans.

### 4. OMAHA PULLS AHEAD

On March 2, 2005, the Omaha Planning Board conducted a public hearing and approved the ordinances. At the Omaha City Council's regularly scheduled meeting on March 8, the ordinances were read for the third time. The council voted to adopt annexation ordinance No. 36947, which did not include the Elk Valley subdivision.

Falling behind, Elkhorn, on March 8, 2005, published notices of special meetings for March 14 and 15. On March 11, Elkhorn conducted a public hearing, at which the planning commission recommended approval of the annexation plans and the ordinances were read for the first time. At the March 14 meeting, Elkhorn's ordinances were read for the second time. On March 15, 7 days after Omaha had adopted its ordinance, Elkhorn's annexation ordinances were read for the final time and the city council voted to adopt them.

### 5. ELKHORN CRIES FOUL

On March 9, 2005, Elkhorn filed a complaint, seeking a temporary injunction and a declaration that Omaha's ordinance was invalid. On March 17, Omaha filed an answer, with affirmative defenses and a counterclaim for a temporary restraining order and temporary and permanent injunctions against Elkhorn's ordinances. In addition, Omaha sought a declaration that its ordinance was valid and that Elkhorn's ordinances were invalid.

On March 21, 2005, the district court, with the agreement of the parties, issued a temporary injunction enjoining the enforcement of both cities' ordinances.

In August 2005, Elkhorn filed its operative complaint. In sum, Elkhorn alleged that (1) Omaha had violated the Act; (2) Elkhorn had taken the first valid step toward annexation, thereby preempting Omaha's annexation proceedings; (3) Omaha could not

annex Elkhorn because the corporate limits of the cities did not adjoin; (4) the Nebraska Constitution prohibited the annexation without a vote; and (5) Omaha's annexation was an unsound and arbitrary response to Elkhorn's annexation plan.

### 6. COURT'S DECISION

Following a bench trial, the court rejected all of Elkhorn's claims that Omaha's ordinance was invalid. Regarding Omaha's claims, the court concluded that Elkhorn had violated the Act at its February 21, 2005, meeting. The court stated that "Elkhorn endeavored to exercise stealth in providing notice of the real purpose of the February 21 Special Meeting." It rejected Omaha's claims that Elkhorn had attempted to annex land that was not adjacent or contiguous. But the court concluded that Elkhorn's annexations were unreasonable and improperly motivated. The court also determined that the annexations were invalid because Elkhorn would be annexed before its ordinances could take effect. Finally, the court accepted Elkhorn's expert's testimony that its population would be over 10,000 if the annexed area were included in the count. It concluded, however, that the evidence did not preclude the annexation because Elkhorn admitted in its complaint that its population on February 21, 2005, was 7,906. In addition to these findings, the court concluded that the Legislature had given Omaha statutory priority over Elkhorn by requiring first class cities to fulfill more statutory requirements than metropolitan class cities and limiting first class cities' annexing authority to only urban and suburban land.

Accordingly, the court permanently enjoined Elkhorn from enforcing its ordinances and declared that Elkhorn would cease to be a city of the first class as of the date the order was filed if Elkhorn did not file an appeal. Elkhorn filed a notice of appeal on August 19, 2005, and on the same day, the court entered a supersedeas order, enjoining both parties from enforcing their ordinances pending an appeal.

### II. ASSIGNMENTS OF ERROR

Elkhorn assigns that the district court erred in (1) ruling that Omaha's annexation proceedings did not violate the Act; (2) ruling that Elkhorn's annexation proceedings violated the Act

when the court did not have jurisdiction to decide that issue; (3) ruling that Omaha could annex Elkhorn because Elkhorn was within the territory Omaha annexed, despite the lack of adjoining boundaries between the cities; (4) failing to conclude that Elkhorn had obtained exclusive jurisdiction to complete its annexations under the prior jurisdiction rule; (5) ruling that Elkhorn's annexation was improperly motivated and unreasonable and that Elkhorn could not provide adequate services when the court lacked jurisdiction over those issues; (6) alternatively, failing to rule Omaha's annexation was improperly motivated, unreasonable, arbitrary, capricious, and void if the court did have jurisdiction to consider those issues; (7) failing to rule that Omaha's annexation was a consolidation or merger without a vote, in violation of Neb. Const. art. XV, § 18(2); and (8) failing to rule that Omaha's ordinance was void and ruling that Elkhorn's ordinances were void.

In its cross-appeal, Omaha assigns that the district court erred in (1) finding that all of the area proposed to be annexed by Elkhorn was adjacent and contiguous to Elkhorn; (2) finding that Riverside Lakes subdivision, across the Elkhorn River from Elkhorn, was adjacent and contiguous; (3) receiving into evidence expert testimony regarding estimates of Elkhorn's population under its proposed annexation plan; and (4) finding that Elkhorn's population would be over 10,000 when the areas proposed for annexation were included.

## III. STANDARD OF REVIEW

An action to determine the validity of an annexation ordinance and enjoin its enforcement sounds in equity. *Cornhusker Pub. Power Dist. v. City of Schuyler*, 269 Neb. 972, 699 N.W.2d 352 (2005); *Swedlund v. City of Hastings*, 243 Neb. 607, 501 N.W.2d 302 (1993). We review actions for relief under the Act in equity because the relief sought is a declaration that action taken in violation of the act is void or voidable. See, *Stoetzel & Sons v. City of Hastings*, 265 Neb. 637, 658 N.W.2d 636 (2003); *Hauser v. Nebraska Police Stds. Adv. Council*, 264 Neb. 944, 653 N.W.2d 240 (2002). On appeal from an equity action, we decide factual questions de novo on the record and, as to questions of both fact and law, we are obligated to reach a

conclusion independent of the trial court's determination. See, *Channer v. Cumming*, 270 Neb. 231, 699 N.W.2d 831 (2005); *Cornhusker Pub. Power Dist. v. City of Schuyler, supra.*

██ Statutory interpretation presents a question of law. *State v. County of Lancaster, ante* p. 376, 721 N.W.2d 644 (2006). Constitutional interpretation is a question of law. *Stewart v. Advanced Gaming Tech., ante* p. 471, 723 N.W.2d 65 (2006). When reviewing questions of law, we resolve the questions independently of the trial court's conclusions. See, *State v. County of Lancaster, supra*; *Reed v. State, ante* p. 8, 717 N.W.2d 899 (2006).

## IV. ANALYSIS

### 1. OMAHA'S ALLEGED VIOLATIONS OF ACT

Elkhorn argues that the district court erred in failing to find that Omaha's annexation proceedings violated the Act. Regarding Elkhorn's standing, its complaint joined two private citizens as plaintiffs. And any citizen of the state may commence an action to declare a public body's action void. See § 84-1414(3). Thus, there is no standing issue presented by Elkhorn's challenge of Omaha's alleged violations of the Act. Omaha argues that even if Elkhorn can challenge its meeting procedures, Omaha did not take any formal action at the first and second readings of its annexation ordinances, which took place on February 22 and March 1, 2005.

██ Section 84-1414(1) provides: "Any motion, resolution, rule, regulation, *ordinance*, or formal action of a public body made or taken in violation of the Open Meetings Act shall be declared void by the district court if the suit is commenced within one hundred twenty days of the meeting . . . ." (Emphasis supplied.) The Omaha City Charter, art. II, § 2.12 (1984), requires an ordinance to be read three times at separate meetings. Accordingly, the readings were necessary steps for passing the ordinance that the Omaha City Council ultimately voted to adopt. Compare *Johnson v. Nebraska Environmental Control Council*, 2 Neb. App. 263, 509 N.W.2d 21 (1993). If any of these readings were declared void because of violations of the Act, the ordinance would necessarily be void as well. We conclude that the readings constituted formal actions.

### (a) Omaha's February 22, 2005, Meeting Gave Reasonable Advance Public Notice

Elkhorn contends that Omaha's February 22, 2005, meeting violated § 84-1411(1) of the Act because Omaha failed to give reasonable advance public notice of the meeting. Section 84-1411(1) provides:

> Each public body shall give reasonable advance publicized notice of the time and place of each meeting by a method designated by each public body and recorded in its minutes. Such notice shall be transmitted to all members of the public body and to the public. Such notice shall contain an agenda of subjects known at the time of the publicized notice or a statement that the agenda, which shall be kept continually current, shall be readily available for public inspection at the principal office of the public body during normal business hours. Except for items of an emergency nature, the agenda shall not be altered later than (a) twenty-four hours before the scheduled commencement of the meeting . . . .

Elkhorn argues that because Omaha cannot alter its agenda later than 24 hours before a scheduled meeting, it also cannot create an agenda later than 24 hours before a meeting. Omaha counters that the Act does not prohibit holding a special meeting with less than 24 hours' notice.

 In the absence of anything to the contrary, we will give statutory language its plain and ordinary meaning. *State v. County of Lancaster, ante* p. 376, 721 N.W.2d 644 (2006). It is not within our province to read a meaning into a statute that is not there. See *Turco v. Schuning*, 271 Neb. 770, 716 N.W.2d 415 (2006).

As noted, § 84-1411(1) provides that "[e]xcept for items of an emergency nature, the agenda shall not be *altered* later than . . . twenty-four hours before the scheduled commencement of the meeting . . . ." If we adopt Elkhorn's interpretation, we would be imposing an unstated requirement: "the agenda shall not be altered [*or created*] later than . . . twenty-four hours before the scheduled commencement of the meeting." Because the statute's 24-hour requirement is directed only at alterations, we decline to read an additional requirement into the statute.

Unlike many states, the Legislature has not imposed a minimum time period for public notification of a special meeting. See, e.g., Cal. Gov't Code § 54956 (West 1997 & Cum. Supp. 2007). Instead, the Legislature permits each public body to designate its own method of notification for all meetings. Under § 84-1411(1), the Legislature has imposed only two conditions on the public body's notification method of a public meeting: (1) It must "give reasonable advance publicized notice of the time and place of each meeting" and (2) it must be recorded in the public body's minutes. *Id.*

Here, the record shows that in 1975, in response to the Legislature's passage of what is now the Act, the Omaha City Council passed resolution No. 1962. This resolution deals with the notification of regular and special meetings. The Omaha City Council minutes contain a record of the action and vote. The resolution designated The Daily Record as the official newspaper for notices of regular meetings. It provided that "notice of special or called meetings of the City Council may be publicized by posting on the bulletin board in the Omaha-Douglas [County] Civic Center in accordance with [the Act] and Section 2.10 of the Home Rule Charter of the City of Omaha." At the time at issue, the Omaha City Charter, art. II, § 2.10 (1976), provided: "Council Members shall be given at least twelve hours written notice of the time and place of such special meetings, except that only two hours notice shall be required when an emergency has been declared."

Omaha conceded that "[a]t no time prior to or during the special meeting of February 22, 2005, did the Mayor or the City Council of Omaha declare the special meeting to be an emergency meeting." So the emergency provision of § 2.10 is not at issue.

Regarding resolution No. 1962, the Omaha city clerk testified that notice was posted to the public on the bulletin boards of the city's offices and on its Web site and that the agenda was available to the public by 10:15 a.m. The agenda provided that two ordinances to extend Omaha's city limits would be read for the first time. Thus, Omaha's notice to the public of its special meeting complied with resolution No. 1962.

Elkhorn, however, argues that Omaha's notice was nonetheless deficient. It argues that Omaha's notice did not comply with § 2.10 of the Omaha City Charter because the council members did not receive a full 12 hours' notice and did not file written waivers of the noncompliance.

Rule 1 of the Omaha City Council's rules of order provides that "[a]ny member by his or her attendance [at a special meeting] shall be deemed to have waived all objections as to notice." Omaha's waiver rule regarding notice to council members parallels our holding regarding notice to the public: a person who has notice of a meeting and attends the meeting must object specifically to the lack of public notice at the meeting, or that person has waived the right to object on that ground at a later date. See *Stoetzel & Sons v. City of Hastings*, 265 Neb. 637, 658 N.W.2d 636 (2003). We conclude that a written waiver of objection is not required.

Moreover, any defect in notice intended for the benefit of council members would not invalidate a council meeting when all of the members attended without objection. See *Pokorny v. City of Schuyler*, 202 Neb. 334, 275 N.W.2d 281 (1979). Five of the Omaha City Council members were present at the city's offices when the city clerk received the mayor's notification of a special meeting. And the city clerk immediately called the two remaining members. The city clerk provided each member with a copy of the call and the mayor's letter requesting the special meeting. Both documents stated that the purpose for the special meeting was the annexation of Elkhorn and surrounding SIDs or other properties.

Additionally, all the members signed the call by 11:01 a.m., and no member objected to the meeting when served with notice. Every council member attended the 10 p.m. meeting and did not object to the meeting or the notification. As in *Pokorny v. City of Schuyler, supra*, the 12-hour notification in § 2.10 of the Omaha City Charter is for the benefit of council members, not the general public. Thus, any defect in the notice did not affect the validity of Omaha's special meeting on February 22, 2005, because they all attended without objection.

Finally, Elkhorn argues that under *Pokorny*, a notification of approximately 12 hours does not comport with the "reasonable

advance publicized notice" requirement in § 84-1411(1). In addition to the defective call issue in *Pokorny*, this court also considered whether the actual notice to the public of a special meeting was sufficient. At a regularly scheduled meeting, the city council scheduled a special meeting to take place the next morning at 10:30 a.m. At 10 o'clock on the night of the regular meeting, the city posted notice of the special meeting in three public places. This court noted that the city did not claim that the Act's emergency meeting provisions were applicable. We concluded that "notice of the meeting of March 16 . . . given by a notice posted in three public places at 10 p.m., on March 15 . . . could hardly be considered to be reasonable advance publicized notice as required by [§ 84-1411]." *Pokorny v. City of Schuyler*, 202 Neb. at 338, 275 N.W.2d at 284.

Elkhorn argues that because 12½ hours notice was insufficient in *Pokorny*, a notice of slightly less than 12 hours cannot be sufficient here. Omaha, however, argues that its notice is factually distinguishable from the notice in *Pokorny* because that notice was posted late at night when it was unlikely to reach the public. We agree that *Pokorny* is not controlling.

In *Pokorny*, we did not state that a 12-hour notice is always insufficient under § 84-1411(1). Instead, we determined that the short time between the notice and the meeting was insufficient because the notice was unlikely to reach the public before the scheduled meeting. In contrast, Omaha provided public notice early on a business day and the city moved quickly to notify many local media outlets. The record shows that Omaha faxed an agenda of the special meeting to the main Omaha newspaper by 10:16 a.m. on February 22, 2005, and to 18 other local media outlets by 10:54 a.m. The Omaha World-Herald published an article about the meeting in its afternoon edition of the February 22 paper. Four television broadcasters were at the meeting, and one station broadcast the meeting live. Therefore, unlike the notice in *Pokorny*, the record shows that Omaha's notice reached a substantial part of the public before the scheduled meeting.

Also, Elkhorn's maneuvers unsurprisingly placed Omaha in a dilemma. Section 2.12 of the Omaha City Charter provides that no ordinance "shall be passed earlier than two weeks after its introduction," except for emergency circumstances which

were not applicable here. So once Omaha learned of Elkhorn's intent to annex surrounding land, its choices were limited. It could act swiftly in giving public notice or face the possibility of being unable to annex if Elkhorn enacted its annexation ordinances first. Although we do not condone the practice of providing only 12 hours' notice before a public meeting, we conclude that under these circumstances, Omaha's notification efforts were reasonable and sufficient.

#### (b) Omaha's Prepublic Meeting and Informational Sessions Did Not Constitute Additional Public Meetings

Elkhorn also contends that Omaha violated the Act on March 1, 2005, by conducting secret meetings with less than a quorum of council members before and after the public meeting. Elkhorn argues that these informal meetings gave council members an opportunity to formulate public policy in private, which violated § 84-1410(4). This statute provides that informal meetings shall not "be used for the purpose of circumventing the requirements of the act." *Id.*

Omaha counters that informational sessions attended by less than a quorum of council members do not violate the Act when no public business is conducted. It argues that "requirements of the Act" are triggered by a meeting of a "public body" and that the Act defines a public body to exclude subgroups of less than a quorum. Brief for appellee at 32.

We have construed public meetings laws broadly so as to obtain the objective of openness in favor of the public. *Wasikowski v. Nebraska Quality Jobs Bd.*, 264 Neb. 403, 648 N.W.2d 756 (2002).

Section 84-1408 provides that "[e]very meeting of a public body shall be open to the public . . . ." Section 84-1409(1)(a) defines "[p]ublic body" to include "governing bodies of all political subdivisions of the State of Nebraska." However, § 84-1409(1)(b) provides: "Public body does not include . . . subcommittees of such bodies *unless a quorum of the public body attends a subcommittee meeting or unless such subcommittees are holding hearings, making policy, or taking formal action on behalf of their parent body.*" (Emphasis supplied.)

Although the Act does not define "subcommittee," a subcommittee is generally defined as a group within a committee

to which the committee may refer business. See Black's Law Dictionary 290 (8th ed. 2004). Here, no business was referred to the groups of three council members. But even construing § 84-1409(1)(b) broadly, we conclude that if the Act does not apply to a subcommittee, it would also not apply to an even lesser subgroup.

The evidence shows that no more than three council members attended any of the informational sessions conducted on March 1, 2005. Section 2.10 of the Omaha City Charter specifies that a quorum of the Omaha City Council is four members for all purposes. Accordingly, the subgroups did not constitute a public body on that ground. Further, the Omaha City Charter, art. II, § 2.11 (1956), provides that apart from disasters, "[n]o less than a majority [a quorum] of the whole Council shall be sufficient to make any determination or effect any action . . . ." Therefore, at the informational sessions, none of the subgroups could have taken formal action. The subgroups were unquestionably not conducting hearings, nor were the subgroups making policy by receiving background information about a policy issue to be decided.

The Act's purpose is to prevent "the formation of public policy . . . in secret." § 84-1408. But it does not require policymakers to remain ignorant of the issues they must decide until the moment the public is invited to comment on a proposed policy. The public would be ill served by restricting policymakers from reflecting and preparing to consider proposals, or from privately suggesting alternatives. See *Hispanic Educ. Com. v. Houston Ind. Sch. Dist.*, 886 F. Supp. 606 (S.D. Tex. 1994). By excluding nonquorum subgroups from the definition of a public body, the Legislature has balanced the public's need to be heard on matters of public policy with a practical accommodation for a public body's need for information to conduct business.

Also, other courts have declined to apply public meeting laws to nonquorum gatherings intended to obtain information or voice opinions. See, e.g., *id.*; *Freedom Newspapers v. Orange Cty.*, 6 Cal. 4th 821, 863 P.2d 218, 25 Cal. Rptr. 2d 148 (1993); *Delaware Solid Waste Authority v. News-Journal*, 480 A.2d 628 (Del. 1984); *Lyon v. Lake County*, 765 So. 2d 785 (Fla. App. 2000); *Mason v. Vision Iowa Bd.*, 700 N.W.2d 349 (Iowa 2005).

It is true that we have been concerned with a public body's perfunctorily approving a decision in a public meeting that was apparently reached in a private meeting. "The prohibition against decisions or formal action in a closed session also proscribes . . . rubberstamping or reenacting by a pro forma vote any decision reached during a closed session." *Grein v. Board of Education*, 216 Neb. 158, 168, 343 N.W.2d 718, 724 (1984). But *Grein* is distinguishable on two counts.

First, *Grein* involved a closed session of a full school board. Obviously, a private meeting of a full public body, or a quorum thereof, raises the concern that the members will reach consensus on a matter of public concern out of the public's view. See, also, *Johnson v. Nebraska Environmental Control Council*, 2 Neb. App. 263, 509 N.W.2d 21 (1993).

Second, the school board in *Grein* immediately voted on an agenda item after a closed session, without further discussion or deliberations. "The necessary inference is that the vote during the reconvened open session was the extension, culmination, and product of the closed session." 216 Neb. at 167-68, 343 N.W.2d at 724. Here, Omaha informed the public of all relevant facts supporting the annexation, and the public had full opportunity to voice its concerns.

Omaha's deputy chief of staff testified that the department heads met with subgroups of council members to familiarize them with the annexation plan that would be presented at the public meeting—specifically, the financial details and geographic areas to be annexed. The minutes of Omaha's March 1, 2005, meeting show that it presented the annexation plan to the public. Therefore, the public received the same information that the individual council members received. See *Centinela Hosp. Ass'n v. Inglewood City*, 225 Cal. App. 3d 1586, 275 Cal. Rptr. 901 (1990). Twenty people spoke against the ordinances, and seven city officials spoke in favor of them. In addition, the public responded with numerous letters, e-mails, and telephone calls. On March 2, the Omaha Planning Board conducted another public meeting regarding the proposed annexation and recommended approval. The city council did not vote on or pass an annexation ordinance until March 8. Thus, the evidence shows

that the Omaha City Council did not reach a final decision on the annexation until it had received the public's input on the plan.

 Elkhorn counters that under § 84-1410(4), "no public body shall designate itself a subcommittee of the whole body for the purpose of circumventing the Open Meetings Act." We need not decide whether, under this section, a subcommittee need be composed of the entire body or a quorum before it could circumvent the Act; because here, the evidence shows Omaha did not attempt to circumvent the Act. As noted, Omaha gave the public access to the same information as the council received and an opportunity to be heard. We conclude that the informational sessions of less than a quorum of the Omaha City Council members did not constitute a public meeting under the Act.

### 2. VALIDITY OF OMAHA'S ANNEXATION

 A municipality that is in the crosshairs of annexation has standing to challenge the annexation. See, *County of Sarpy v. City of Gretna*, 267 Neb. 943, 678 N.W.2d 740 (2004); *Wagner v. City of Omaha*, 156 Neb. 163, 55 N.W.2d 490 (1952). Elkhorn has standing. Elkhorn alleges that Omaha's annexation was invalid for three reasons: (1) Omaha's annexation was second in time to Elkhorn's annexations and therefore void under the prior jurisdiction rule, (2) Elkhorn and Omaha are not adjoining as required under § 14-117, and (3) Omaha's annexation violates Neb. Const. art. XV, § 18(2).

### (a) Prior Jurisdiction Rule Does Not Apply

Elkhorn argues that it took the first valid step toward annexation and that under the prior jurisdiction rule, Omaha's attempted annexation was therefore void. Omaha counters that the prior jurisdiction rule does not apply to these proceedings because the cities were not attempting to annex the same land. We agree.

Under the prior jurisdiction rule, when two public bodies claim jurisdiction over the same territory in annexation proceedings, the public body which takes the first valid step toward annexation has the superior claim. And it may complete its proceedings if it acts promptly and in accordance with statutory requirements. See, *Emerson Electric Mfg. Co. v. City of Ferguson*, 376 S.W.2d 643 (Mo. App. 1964); *City of West Fargo v. City of*

*Fargo,* 251 N.W.2d 918 (N.D. 1977); 2 Eugene McQuillin, The Law of Municipal Corporations § 7:39 (3d ed. 2006 & Cum. Supp. 2006). Omaha correctly points out that in more recent decisions, some courts have declined to apply the prior jurisdiction rule as antiquated or superseded by statutory procedures. See, *Des Moines v. City Development Bd.,* 473 N.W.2d 197 (Iowa 1991); *Village of Farmington v. Minnesota Municipal Comm.,* 284 Minn. 125, 170 N.W.2d 197 (1969); *In re Enlargement and Ext. of D'Iberville,* 867 So. 2d 241 (Miss. 2004). Further, Elkhorn has not directed our attention to any case in which a court applied the rule to annexations of different territories.

■ The same subject matter is assumed in the "prior in time is prior in jurisdiction" rule because it promotes the orderly administration of conflicting interests. 2 McQuillin, *supra* at 674. We need not determine whether to adopt the prior jurisdiction rule because we conclude that the rule is not applicable when different territories are the subject of the competing annexations. A map introduced into evidence by Elkhorn for demonstrative purposes shows that Omaha and Elkhorn were not attempting to annex the same land. Therefore, the prior jurisdiction rule does not apply to invalidate Omaha's annexation.

### (b) Omaha and Elkhorn Are Adjoining as Required by § 14-117

Section 14-117, in relevant part, provides:

> The city council of any city of the metropolitan class may at any time extend the corporate limits of such city over any contiguous or adjacent lands, lots, tracts, streets, or highways, such distance as may be deemed proper in any direction, and may include, annex, merge, or consolidate with such city of the metropolitan class, *by such extension of its limits,* any adjoining city of the first class having less than ten thousand population or any adjoining city of the second class or village.

(Emphasis supplied.)

Elkhorn does not dispute Omaha's general power to simultaneously annex several contiguous tracts to reach Elkhorn's boundary. And the district court correctly concluded that Elkhorn's proposed annexations were also dependent upon this principle.

Nonetheless, Elkhorn contends that § 14-117 limits Omaha's annexation of cities to those with which Omaha has a common corporate border without any intervening land. Elkhorn argues that the term " 'adjoining' city" has a meaning distinct from contiguous or adjacent land. Brief for appellant at 36. Omaha, however, contends that the terms " 'contiguous' " and " 'adjoining' " are synonymous and that the Legislature was not attempting to create a legal distinction between the annexation of cities and other land. Brief for appellees at 54.

The Legislature recently added the "contiguous or adjacent" requirement to a metropolitan city's annexation of surrounding lands and removed a restriction against the annexation of agricultural and rural lands. See 1998 Neb. Laws, L.B. 611. This court, however, has previously analyzed annexations under § 14-117 to determine whether the annexed area was sufficiently joined. See *Wagner v. City of Omaha*, 156 Neb. 163, 55 N.W.2d 490 (1952). In *Bierschenk v. City of Omaha*, 178 Neb. 715, 722, 135 N.W.2d 12, 16 (1965), we held that "a city of the metropolitan class may annex an area by extending its boundaries to form a common one with the portion annexed if the area so attached is urban in nature and is connected to the city by a substantial link of narrower land of the same character." Similarly, in *Wagner v. City of Omaha, supra*, we stated that "[i]t was clearly not the intention of the Legislature, if [a residential] area develops outside the boundaries of a metropolitan city, to prevent such city from annexing it." 156 Neb. at 168, 55 N.W.2d at 494.

We have interpreted the "contiguous or adjacent" requirement in statutes governing the annexation powers of other classes of cities to determine how substantial the link between a city and annexed area must be under this standard. We have held that the terms contiguous and adjacent in annexation statutes are synonymous. And substantial adjacency between a municipality and annexed territory exists when a substantial part of the municipality's boundary is adjacent to a segment of the boundary of the city or village. *Swedlund v. City of Hastings*, 243 Neb. 607, 501 N.W.2d 302 (1993). A city may not annex a tract of land by simultaneously annexing a 120-foot-wide strip of land to reach the tract. *Johnson v. City of Hastings*, 241 Neb. 291,

488 N.W.2d 20 (1992). But we have upheld an annexation of a residential area reached through the simultaneous annexation of connecting land six blocks wide. See *Swedlund v. City of Hastings*, 243 Neb. at 611, 501 N.W.2d at 306 ("entire eastern boundary of the annexed [connecting] property is contiguous with the entire western boundary of a residential area [reached through connecting property]"). Thus, we have implicitly recognized in *Wagner, Bierschenk*, and *Swedlund* that a municipality may annex several tracts as long as one tract is substantially adjacent to the municipality and the other tracts are substantially adjacent to each other. See 2 Eugene McQuillin, The Law of Municipal Corporations § 7:32 (2006). The question remains, however, whether the "adjoining city" language in § 14-117 required Omaha to have a common border with Elkhorn before annexing it.

Absent anything to the contrary, we give statutory language its plain and ordinary meaning. *White v. White*, 271 Neb. 43, 709 N.W.2d 325 (2006). We will not read anything plain, direct, or unambiguous out of a statute. *McCray v. Nebraska State Patrol*, 271 Neb. 1, 710 N.W.2d 300 (2006). And if possible, we will try to avoid a statutory construction which would lead to an absurd result. See *Curran v. Buser*, 271 Neb. 332, 711 N.W.2d 562 (2006).

Omaha correctly argues that the terms "contiguous" and "adjoining" in § 14-117 are synonymous. See Webster's Third New International Dictionary of the English Language, Unabridged 27, 492 (1993). Any of the three terms—contiguous, adjacent, and adjoining—could be literally applied to require that a city's boundaries abut or touch the boundaries of territory to be annexed. See *id.* at 26-27, 492. But under the "contiguous or adjacent" standard, we have not required common boundaries. As noted, we have interpreted the standard to require the city and annexed territory to be nearby in proximity and allowed cities to reach annexed territory through the simultaneous annexation of a substantial link of connecting territory. We conclude that § 14-117 requires the same application for the term "adjoining city."

Under Elkhorn's interpretation of § 14-117, part of the statute's language is meaningless. If "adjoining city" meant that

Omaha could annex only cities with which it shared a common border, then the Legislature would not have specified that a metropolitan city could annex an adjoining city by "extension of its limits." *Id.* Similarly, § 14-117 allows Omaha to "include" an "adjoining city" in an annexation of contiguous or adjacent lands. But even if Omaha had annexed all of the land surrounding Elkhorn so that Elkhorn was merely "included" within a larger territory, under Elkhorn's interpretation, the annexation would still be invalid because its corporate limits did not touch Omaha's corporate limits. This would lead to the absurd conclusion that the Legislature intended to give Omaha power to annex large tracts of land in any direction, but not the cities eligible for annexation within that land unless they shared a common border. We conclude that under § 14-117, the Legislature intended to permit a metropolitan city to extend its corporate limits so that it adjoins the corporate limits of a city to be annexed.

### (c) Omaha's Annexation Ordinance Is Constitutional

Elkhorn contends that under Neb. Rev. Stat. §§ 14-120 to 14-124 (Reissue 1997), Omaha's annexation of Elkhorn is effectively a merger and consolidation. Those sections explain the rights and responsibilities of a metropolitan city and any city that it annexes or merges with. Elkhorn argues that because the effects of an annexation or merger are the same, Omaha was required to comply with Neb. Const. art. XV, § 18(2), which provides:

> The Legislature may provide for the merger or consolidation of counties or other local governments. No merger or consolidation of municipalities or counties shall occur without the approval of a majority of the people voting in each municipality or county to be merged or consolidated as provided by law. . . . Annexation shall not be considered a merger or consolidation for purposes of this section.

Despite this section's explicit provision that it does not apply to annexations, Elkhorn argues that the provision was intended to apply only to unincorporated territories or SIDs. It argues that article XV, § 18(2) would be meaningless if it applied to the annexation of a city or village. Elkhorn's argument runs wide and shallow. It does not explain why it concludes the provision

would be meaningless if it applies only to mergers or consolidations of municipalities and counties, nor do we find it necessary to reach that issue.

■ Constitutional provisions are not open to construction as a matter of course; construction is appropriate only when it has been demonstrated that the meaning of the provision is not clear and therefore construction is necessary. *Pony Lake Sch. Dist. v. State Committee for Reorg.*, 271 Neb. 173, 710 N.W.2d 609 (2006). The words in a constitutional provision must be interpreted and understood in their most natural and obvious meaning unless the subject indicates or the text suggests that they are used in a technical sense. *State ex rel. Lemon v. Gale, ante* p. 295, 721 N.W.2d 347 (2006).

Here, the provision needs no interpretation and could not be more plainly stated. If the people had intended to prevent unilateral annexations, the provision excluding annexations from the requirement of a vote would not have been included. Further, the Legislature undertook no simultaneous amendments of Nebraska's annexation statutes. We conclude that this argument is without merit.

### 3. EFFECT OF OMAHA'S ANNEXATION ON ELKHORN

The district court concluded that Elkhorn's annexations were invalid for several reasons. We need not reach those issues because we agree with the district court's conclusion that Elkhorn would be annexed before its ordinances could take effect.

Upon the effective date of a metropolitan city's annexation ordinance

> the laws, ordinances, powers, and government of such metropolitan city shall extend over the territory embraced within such city or village so annexed . . . . [A]nd after said date the metropolitan city shall succeed to all the property and property rights of every kind . . . held by or belonging to the city or village annexed . . . .

Neb. Rev. Stat. § 14-118 (Reissue 1997).

In addition, upon a metropolitan city's annexation of a city taking effect, "the terms and tenure of all offices and officers [of the annexed city] shall terminate and entirely cease." § 14-124. The only exception is their duty to deliver to the officers of the metropolitan city any "books, papers, bonds, funds, effects or

property of any kind in their hands or under their control belonging to [the annexed city]." *Id.* Therefore, upon the effective date of Omaha's annexation of Elkhorn, it ceased to exist as a separate municipality, and its former territory was governed solely by Omaha's laws. See, *State ex rel. Andersen v. Leahy*, 189 Neb. 92, 199 N.W.2d 713 (1972); 62 C.J.S. *Municipal Corporations* § 64 (1999). Compare *School Dist. of Bellevue v. Strawn*, 185 Neb. 392, 176 N.W.2d 42 (1970).

The district court correctly noted that Omaha's annexation ordinance became effective on March 24, 2005, and that Elkhorn's annexation ordinances would have become effective on March 30. However, Elkhorn's annexation proceedings were nullified on March 24, when it ceased to exist as a separate municipality.

## V. CONCLUSION

We conclude that the Omaha City Council did not violate the Act during its meetings on February 22 or March 1, 2005. We further conclude that the prior jurisdiction rule did not apply to abate Omaha's annexation proceedings; that § 14-117 authorized Omaha to annex Elkhorn, despite the lack of a common municipal border; and that Neb. Const. art. XV, § 18(2), did not apply to require a vote on the annexation. Finally, we conclude that Elkhorn ceased to exist as a separate municipality on March 24, 2005, the date that Omaha's annexation ordinance became effective. Elkhorn's annexation ordinances were accordingly nullified before they took effect.

AFFIRMED.

HEAVICAN, C.J., not participating.